## MARIE ELLEN FITZPATRICK *v.* ORION C. MICHAEL.

[No. 36, October Term, 1939.]

250

*Decided November 29th, 1939.*

The cause was argued before OFFUTT, SLOAN, MITCHELL, and DELAPLAINE, JJ.

*A. Freeborn Brown,* for the appellant.

*J. Wilmer Cronin,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

In the summer of 1936, Marie Ellen Fitzpatrick, a native and resident of Harford County, who was then about fifty-two years old, was employed by Orion C. Michael, of Aberdeen, in that county, as a practical nurse for his wife, who was an invalid, and she remained in that employment until the wife's death in February, 1937. Upon Mrs. Michael's death, Miss Fitzpatrick informed her employer that she was about to leave his home, and Michael, who was then about seventy-six years only, and apparently in uncertain health, asked her to wait a few days, that he wanted to talk over his plans for the future with her. She did remain and a few days later he spoke to her of his age, told her that he had no relatives or friends, and that "he wanted company and some one to look after and take charge of his home, his flowers, drive him around in the automobile, care for him when he was sick or needed attention, and, as she had been so kind and attentive to his sick wife, had rendered her such valuable services in nursing and caring for her for about five or six months in the last months

of her life, that he wanted the complainant to remain with him the balance of his life, and take full charge of his home, nurse him when it was necessary, look after his flowers, drive him around in the automobile and be company for him, that while he could not pay her much money, only eight ($8.00) per week, that if she would stay, that in addition to the eight dollars ($8.00) per week, that his home on the said Bel Air Avenue would be her home with board as long as he lived, and that he would make a will that upon his death his home property, with all the furniture and furnishings, should be hers for the balance of her life, and that his automobiles would be hers absolutely." Miss Fitzpatrick accepted the offer and continued to serve Michael under the contract until April 6th, 1939, when he terminated the employment. During that period Michael appears to have been entirely satisfied with her services and she took "full charge of his large home, looking after his flower garden, the furnace in his residence, driving him to his office and back daily, as well driving him on pleasure and business trips of many thousand miles on a trip, nursing him at times when he would be confined to his bed for as long as four or five weeks at a time, as well as looking after him both daily and at night from causes such as arterial schlorosis that comes with age, a heart with a missing beat, as well as on many nights required to keep hot water bottles to his back and feet all night to make him a little comfortable, all of these services the defendant apparently appreciated and valued by telling the neighbors what a wonderful nurse and housekeeper the complainant had been, and if it were not for her, he did not know what he would do, for he was not on very friendly terms with the distant relatives, who did not visit him, and several did not speak to him." In March, 1939, she drove him to Miami, Florida, accompanied him to Cuba, and drove him back to his home in Aberdeen, and on their return he had the following personal item published in a local newspaper: "Mr. O. C. Michael, prominent business man of Aber-

deen, and Miss Mazie Fitzpatrick, also of Aberdeen, have returned to their home after a vacation of several weeks in Florida. The trip was made by automobile, Miss Fitzpatrick driving the entire distance of 4,400 miles without the least mishap either with motor or tires. Cuba was also visited."

To carry out his undertaking, Michael, in the summer of 1937, executed a will in which he left to Miss Fitzpatrick his home and its furnishings for life, and his automobiles absolutely. Then on or about December 21st, 1938, he executed a second will with her consent, in which he changed the term of her tenancy from life to fifteen years. Finally he executed in March, 1939, a third will, in which, while making changes as to other bequests and devises, he left the provisions affecting her unchanged.

After the trip to Florida, Michael's attitude towards Miss Fitzpatrick underwent a complete and, to her, highly objectionable change. On April 4th of this year he left his home for his office and did not return, although so far as she knew their friendly relations were unchanged, and on April 6th he attempted to force her to leave the home by cutting off the light, water, heat, and telephone, and also the food supplies, and when that blockade proved ineffective, he had her arrested for trespass, and while she was under arrest he locked up the house, so that she was unable to enter it, although she had property of her own in it.

Miss Fitzpatrick attributes the change to the jealousy of relatives, for she alleges "the defendant until he left his home as aforesaid had been carrying out his promises under his said agreement for valuable services rendered and to be rendered until his death, with the exception that he had not fully paid her the weekly wages due, and no doubt would have returned to his own home as he always did, but for the jealousies of some distant relatives, who succeeded in keeping him away from his home by making him believe the courts would not allow him to return, until they had so poisoned his mind against your com-

plainant to take steps to force her out of his home, that the respondent stated that the reason he did not return to his home was because he was under the law and could not return, notwithstanding the complainant was ready, willing and able to provide him with all the comforts, nursing, and the necessary attention for properly looking after and caring for him, and would have been glad to have continued to perform her agreement with the respondent for his comfort." Following her removal from Michael's home, Miss Fitzpatrick on May 9th of this year filed the bill of complaint in this case against Michael, and in it, after alleging the facts which have been stated, she asked that the respondent be required to specifically perform his contract with her, and that a receiver be appointed to take charge of "all the estate, both real and personal, of the respondent, to collect all money, rents, etc., and to pay this complainant the weekly sum of eight dollars ($8.00) per week as long as the respondent lives, and to provide her in the respondent's Aberdeen residence a home with board and lodging so long as the respondent lives, upon the complainant looking after the respondent's home, flowers, driving his automobile, and nursing and caring for the respondent in compliance with her said agreement, with the said respondent."

The defendant demurred to the bill for a general want of equity, the demurrer was sustained and the bill dismissed, and from that decree the plaintiff appealed.

There can be no possible doubt that upon those facts the plaintiff should be entitled to some relief against the defendant, but the question in this case is whether the remedy is in equity.

A contract to make a will is not invalid because of its subject matter (69 *A. L. R.* 18 *et seq.*), for, since one may bargain, sell, give away, or otherwise surrender every right and property interest which he has, there can be no sound reason why he cannot also validly agree to dispose of it by will. *Ibid; Lorenzo v. Ottaviano,* 167 Md. 138, 144, 173 A. 17, 179 A. 536. Nor, since Michael

254

may not have lived for a year after it was made, can it be said that, apart from any question of part performance, that the contract is invalid because it was not embodied in a writing signed by the party to be charged, as required by clause 5 of the fourth section of the Statute of Frauds (*Alexander's British Statutes,* pp. 511, 534), because there was a possibility that it might be performed within a year. *McGrath Co. v. Marchant,* 117 Md. 472, 479, 83 A. 912; *Ellicott v. Turner,* 4 Md. 476; *Horner v. Frazier,* 65 Md. 1, 12, 4 A. 133; *Cole v. Singerly,* 60 Md. 348, 353; *Browne on Statute of Frauds,* sec. 273 *et seq.; Warren v. Ayres,* 126 Md. 551, 557, 95 A. 52. But, as it relates to an interest in land, it is within clause 4 of the section (*Hamilton v. Thirston,* 93 Md. 213, 218, 48 A. 709; *Semmes v. Worthington,* 38 Md. 298; *Coe's Alexander's Brit. Stat.* 720 *et seq.,* and cases there cited), and unenforceable unless the bar of the statute is removed. *Fry on Spec. Perf.,* sec. 561 *et seq.* That may be done by sufficient proof that the plaintiff has performed it in part, and is willing and able to continue to do those things which under it she undertook to do. *Ibid.; Coe's Alexander's Brit. Stat.* 696 *et seq.; Lorenzo v. Ottaviano, supra; Neal v. Hamilton,* 159 Md. 447, 448, 150 A. 867. The doctrine of part performance, however, is peculiar to equity, and may not be invoked in courts of law (*Hamilton v. Thirston, supra,* 93 Md. page 219, 48 A. 709), so that, unless the facts present a case of equitable jurisdiction, the appellant has no remedy on the contract either at law or in equity. 69 *A. L. R.* 20.

But no ground of equitable jurisdiction can be found in the facts stated, unless it be that she has no adequate remedy at law. But even though there is no adequate remedy at law, equity will not, ordinarily, specifically enforce a contract for personal service, for these reasons, one, that the mischief likely to result from the enforced continuance of the relationship incident to the service when it has become personally obnoxious to one of the parties is so great that the best interests of society require that the remedy be refused (*Fry on Spec. Perf.*

[5th Ed]., secs. 110, 112), for, as stated by Fry, "The relation established by the contract of hiring and service is of so personal and confidential a character that it is evident that such contracts cannot be specifically enforced by the court against an unwilling party with any hope of ultimate and real success; and accordingly the court now refuses to entertain jurisdiction in regard to them. * * * But the difficuly of enforcing such conracts in specie is now admitted by the courts. It is not for the interest of society that persons who are not desirous of maintaining continuous personal relations with one another should be compelled so to do." The other reason is, that courts have not the means nor the ability to enforce such decrees. *Pomeroy, Spec. Perf.*, secs. 22, 310. Nevertheless there is a class of cases in which, although the contract is not actionable under the Statute of Frauds, it has been performed by the rendition of services the value of which cannot be estimated in terms of money, and in such cases, when it appears that a monetary award will not place the parties in *statu quo,* or adequately compensate the complaining party, equity may grant relief in the nature of a specific performance of the contract. 69 *A. L. R.* 21; *Neal v. Hamilton, supra; Pomeroy Spec. Perf.* 114. Executory contracts are not, however, within the scope of that principle, which can only be invoked where the employment has been terminated by the expiration of the term of employment, by the death of one of the parties, or in some other manner inconsistent with the possibility of future or continuing service under the contract. For, during the term of employment, where it is for an indefinite period, when both parties are living and specific performance would mean compelling one party to accept and the other to render services, the reasons for the refusal of courts of equity to decree specific performance of such contracts apply, and that relief will be refused even though there be no adequate remedy at law, for it would result in a species of peonage on the part of the servant, or an enforced association with an obnoxious employee on the

part of the master, which would be intolerable. So it is said: "By reason of the doctrine of mutuality, a court of equity will refuse to decree the specific performance of an executory contract wherever it creates a duty from the plaintiff of such confidential or personal nature that the court could not have enforced it at the instance of the defendant. After the services have been rendered, however, the reason for the foregoing rule no longer applies, the contract having become mutual in both obligation and remedy, and specific performance of a contract will not be denied because the consideration consists of personal services, where all such services have been fully performed." 25 *R. C. L.* 305.

Two comparatively recent cases in this court illustrate applications of those principles. In one, *Reed v. Reed*, 165 Md. 604, 169 A. 798, the court refused to specifically enforce a contract for service between a father and son, because the contract was executory, and stated as the ground for the decision, that "The suit is directed to the enforcement of a contract providing, as one of its essential purposes, for the rendition by the plaintiff of personal services. The performance of such a duty on his part could not be compelled by a specific enforcement suit instituted by the other party to the contract. This want of mutuality with respect to such an equitable remedy renders it unavailable to either of the parties, the contract being executory as to all of their respective duties under its provisions. 5 *Pomeroy's Equity Jurisprudence* (2nd Ed.), p. 4894; 25 *R. C. L.*, pp. 232, 303, 305; 58 *C. J.*, pp. 866, 1056; *Miller's Equity Procedure*, p. 791; *Reed & Fibre Products Corp. v. Rosenthal*, 153 Md. 501, 518, 138 A. 665; *Sterback v. Robinson*, 148 Md. 24, 32, 128 A. 894." The other case is *Neal v. Hamilton, supra,* where the promisor was dead, and the contract executed, and there the court did decree specific performance. They are further illustrated by cases cited in annotations to *Andrews v. Aikens,* 69 *A. L. R.* 14, which involves the rights of the parties prior to the death of the promisor, and *White v. Massee,* 66 *A. L. R.*

1439; *Pomeroy on Spec. Perf.*, secs. 310, n, 22; *Fry on Spec. Perf.*, secs. 110-112; 58 *C. J.* 1056-1058.

The limitation which the rule imposes upon equitable jurisdiction at times results in the denial of any adequate remedy to one who has been injured by the breach of such a contract, and courts have striven to discover some alternate remedy which, in cases of unusual and extreme hardship, would afford to the promisee some measure of relief. So in England, where such contracts contained negative covenants, while the courts at first, in cases where specific performance of the affirmative covenants could not be enforced, also refused to enforce the negative covenants, later, beginning with *Lumley v. Wagner,* 1 DeG. M. & G. 604, their power to enforce negative covenants was recognized, although that might indirectly result in compelling the specific performance of the affirmative covenants. In *Lumley v. Wagner,* the negative stipulation was express, but later cases, upon its reasoning, extended the principle which it announced to cover implied covenants, but that extension appears to have been disapproved in *Whitwood Chemical Co. v. Hardman* [1891], 2 Ch., pp. 427, 430, and Fry, criticising the extension of the doctrine, says: "It is not easy to see the limits to which the doctrine of an implied negative might be carried; for as A and not-A include the whole world, it follows that a contract to sell to A or to sing at A must imply a negation of a sale to not-A or a singing at not-A; and if injunction is to be granted where specific performance might be impossible, the logical conclusion of the doctrine would be a great and rather formidable enlargement of the jurisdiction of equity." *Fry, Spec. Perf.,* sec. 857.

In the early case of *Burton v. Marshall,* 4 Gill 487 (Brantly's Ed. 381), this court refused to adopt the doctrine of implied negative covenants, but in *Equitable Gaslight Co. v. Baltimore Coal-Tar & Mfg. Co.,* 63 Md. 285, it did affirm a decree enjoining the breach of an implied negative covenant, but in doing so it stated that it would not grant that relief in cases for the delivery

of chattels which it could not specifically perform. In reaching the conclusion that equity might enjoin the breach of implied negative covenants in contracts which it could specifically enforce, the court ignored *Burton v. Marshall,* and relied on *Wolverhampton & Walsall Ry. v. London & Northwestern Ry. Co.,* L. R. 16 Eq. 440, in which Lord Selborne expressed a doubt that even an express negative covenant can be relied on, if the contract is not of such a nature as to be the proper subject of equitable jurisdiction. The vicissitudes of the doctrine are noted in a very useful annotation to *Burton v. Marshall, supra.* There is a distinction between cases in which the contract provides merely for employment and compensation, in which a refusal to serve or to pay is the negation of a promise to pay or to serve, and cases where the services involve and imply some rare and unusual quality in the promisor which, if given to a competitor of the promisee might cause him a loss by the diversion of custom in addition to what he might suffer from the loss of custom which the services of the promisor might attract, and that consideration apparently underlies the decisions in many of the cases enforcing negative covenants. There are, however, cases in which the doctrine of the enforcement of implied negative covenants has been carried far beyond the present state of law in England, and beyond what seems to be the weight of the best considered authority here, but, taking the law as we find it, it may safely be said that equity will not enforce a negative covenant, express or implied, in a contract which it cannot specifically enforce, unless a breach of the negative covenant will cause a loss to the promisee distinct from that resulting from the mere failure of the promisor to carry out his affirmative promise. Applying that principle to contracts for personal services, the sounder rule is that equity will not enforce negatively a contract which it could not enforce affirmatively, nor will it enjoin the breach of a negative covenant, express or implied, unless the breach will cause a loss to the promisee inde-

pendent of the loss caused by the mere failure of the promisor to keep and perform his affirmative covenants. *Pomeroy, Spec. Perf.*, secs. 24, 25; *Welty v. Jacobs,* 171 Ill. 624, 49 N. E. 723; *Fry on Spec. Perf.*, sec. 852 *et seq.;* 58 *C. J.* 1145, 1233; 25 *R. C. L.* 305; *Equitable Gaslight Co. v. Baltimore Coal-Tar & Mfg. Co., supra; Burton v. Marshall, supra.*

Applying those principles to the facts of this case, the conclusion that the plantiff is not entitled to any relief in equity seems inevitable. The contract was essentially one for the rendition of personal services. They were varied, it is true, but they required no extraordinary or unusual skill, experience, or capacity. Under the employment, the appellant acted as nurse, chauffeur, companion, gardener, and housekeeper, and, while it may be difficult to appraise in monetary terms the value of services so varied, nevertheless they involved no more than doing such things as a housewife often does as a part of the ordinary routine of life. The reasons for the general rule that equity will not specifically enforce contracts for personal service apply with plenary force to the facts conceded here. Assuming that appellee broke the contract, that the breach was whimsical, arbitrary, and unjust, and induced by the intrigue of greedy relatives, nevertheless its enforcement would compel him to accept the personal services of an employee against his wish and his will. The court can no more compel him to accept her services under such conditions, than it could compel her to render them if he demanded them and she were unwilling to give them. It follows that the decree must be affirmed.

*Decree affirmed, with costs.*