GEORGE A. EVANS, ET AL. *v.* BETH LEE BUCHANAN, ET AL.

[No. 33, April Term, 1944.]

Decided June 14, 1944.

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, and CAPPER, JJ.

*Webster S. Blades* with whom were *Blades & Rosenfeld* on the brief, for the appellants.

*Paul F. Due* and *W. Hamilton Whiteford,* with whom were *Due, Nickerson & Whiteford* on the brief, for the appellees.

BAILEY, J., delivered the opinion of the Court.

This is an appeal by the administrators of the estate of John C. Niner from a decree of the Circuit Court for Baltimore City directing the administrators to endorse and deliver to Beth Lee Buchanan and George M. Downs, the appellees, all the outstanding stock of The J. C. Niner Company, a Maryland corporation. The decree was entered in a suit filed by the appellees against George A. Evans and Daisy V. Niner, the said administrators, for the specific performance of an alleged oral contract entered into by them with John C. Niner in 1927.

The facts in the case are, for the most part, undisputed. John C. Niner had been employed for many years by the American Type Founders Company, a company dealing in printers' supplies. In the summer of 1927 he was holding the position of sales manager of the company in Baltimore. Niner, who was then 49 years old, became dissatisfied when the son of the local manager of the company was promoted to assistant manager. Miss Buchanan, one of the appellees, then 34

years of age, had been employed by the American Type Founders Company as cashier for two years, and her roommate, a Miss Campbell, was employed by the Moore Machinery Company, which was using the same office. Miss Buchanan and Miss Campbell were friends of Niner and of his wife, Daisy V. Niner. He often talked with them about his disappointment in not being promoted to assistant manager.

As Niner is now dead and Miss Buchanan is incompetent to testify as to any transactions with or statements made by him, because of the provisions of Section 3, Article 35, Code 1939, we have only the testimony of Miss Campbell as to this and subsequent conversations between Niner and Miss Buchanan.

Miss Campbell's testimony is substantially as follows: that on one occasion, when the three of them were at lunch together and the matter was discussed, Miss Buchanan said, "why don't you go into business for yourself?" that Niner stopped a few minutes and said, "I couldn't do it, I couldn't do it," explaining that, with one exception, no independent company had ever been able to compete successfully with the American Type Founders Company; that the matter was the subject of continual discussion; that "it seemed to form a germ and it kept growing" with the result that desks, typewriter, telephone books and other equipment were moved into the apartment occupied by Miss Buchanan and Miss Campbell; that Niner would come to the apartment in the evening and stay until about nine o'clock, working with Miss Buchanan over the correspondence; that an office was selected at 16 South Gay Street and second hand office equipment was purchased; that Niner had $5,000 which he agreed to put in the business which was to be called The J. C. Niner Company; that Miss Buchanan agreed to leave the American Type Founders Company and work with the new business at the same salary which she was then receiving; that Niner was to be the salesman and Miss Buchanan was to keep the books and attend to the general office work, but that some one would

be needed to look after the stock on the shelves and to get out the orders; that George M. Downs, one of the appellees, then 28 years old, was employed by the American Type Founders Company as a stock room clerk and inside salesman, and that Niner thought of him for this position; that Downs was invited in July or August to meet Niner, Miss Buchanan and the witness at dinner at the Refectory Lunch Room, at which time he was asked to join in the venture.

The witness, Miss Campbell, was asked what Niner said to Downs at that time and her reply was as follows: "Mr. Niner told him they were starting in as an independent, he told him the pros and cons, he told him it would be a venture; no other, with the exception of one company, had been able to exist, the American Type had put them out of business, it was a gamble. He told Mr. Downs what his work would be, which was pretty nearly everything that might be done in an office, as well as selling. He said 'you are giving up a good job, a job you will be in until you die, probably for something that is uncertain', but he said 'George, I want you to think it over, I want you to come with us. If you do come with us and stick, the business will be yours and Beth's when I die', and he said 'it will be yours, lock, stock and barrel'."

Miss Campbell was then asked if Miss Buchanan made any statement as to whether or not she was coming into the proposition when Niner put it to Downs and her answer was: "Oh, yes, yes definitely. Miss Buchanan was coming in—or, not only was, but had; they had worked out these plans together."

Thereafter, in November, 1927, the business was opened on Gay Street, with Miss Buchanan and Downs operating the office and stock room and with Niner soliciting business as outside salesman. On January 2, 1928, The J. C. Niner Company was incorporated, the assets of the business were transferred to the corporation and sixty shares of the capital stock of the par value of $100 per share were issued in the name of Niner. On December 14, 1934, a stock dividend of ninety shares was de-

clared and issued to Niner. On December 28, 1939, the two stock certificates, for sixty and ninety shares, respectively, were surrendered and in exchange therefor Niner was issued five certificates for thirty shares each.

Niner died on October 27, 1943, intestate, leaving surviving him his widow and certain collateral relatives. At the time of his death The J. C. Niner Company had an approximate net worth of $29,000. Niner left other assets in the approximate amount of $60,000, which passed to his widow as the surviving joint owner. Downs and Miss Buchanan were still employed by The J. C. Niner Company at the time of Niner's death.

In addition to the testimony of Miss Campbell relative to the formation of the contract, the appellees produced seven business acquaintances of Niner, wholly disinterested witnesses, who testified to statements made by Niner, from the time of the founding of the business in 1927 until shortly before his death in 1943, confirming the formation and existence of the agreement sought to be enforced. We deem it unnecessary to give a detailed recital and analysis of this testimony. The testimony of J. B. Thomson is typical. He was a partner of the Shane-Beever Company, manufacturers of electrotype and print plates, and an intimate friend of Niner. His testimony is as follows: "I dropped in late in the afternoon and we got to talking shop, and it was at that time—I couldn't even tell you the date—that he referred to business conditions. They had been pretty good, and we sort of had something in common in connection with the subject, because my former senior partners had done the same thing that he referred to in the case of Miss Buchanan and Mr. Downs. And he said—he used to call me Tommy—he said, 'Tommy, I have done pretty well; I don't need a whole lot of money, my wife is amply taken care of; the business after I die will go to Mr. Downs and Miss Buchanan', * * * and I mentioned I thought that was very fine for those who had helped him build the business; and he said, 'Mrs. Niner will not have to worry,

and these two have helped me build it, and when I die there will be plenty for her'."

In further corroboration of the agreement the appellees proved that on May 24, 1928, Niner assigned to Miss Buchanan the certificate for 60 shares of stock issued to him at the time of the incorporation of the company. At the same time he procured a life insurance policy for $5,000, the amount of his investment in the company, naming his wife as beneficiary therein. The premiums on this policy were always paid by the company. On April 8, 1935, the certificate for 90 shares, issued to him on December 17, 1934, was likewise assigned to Miss Buchanan. His signature was witnessed by Arthur Leaf. Leaf's testimony is significant. He was asked if there was any discussion on Niner's part as to the transaction, and his reply was as follows: "At that time he say, 'now, this is one step in the arrangement I have. George and Beth are to have this business as theirs when I am gone'. He says, 'Daze'—that is Daisy, his wife,—'don't want anything to do with this business because she don't know a printing press from anything else in the country. This is to be George and Miss Buchanan's business'."

As opposed to this testimony the appellants lay great stress upon the testimony to the effect that on December 28, 1939, Niner requested Miss Buchanan to return to him the two stock certificates which had been assigned to her by him; that the said certificates were surrendered and cancelled; that in exchange therefor five new certificates for thirty shares each were issued and delivered to Niner; and that they were never assigned by him but were still in his name at his death. They likewise insist that the conduct and statements of Miss Buchanan subsequent to the death of Niner are inconsistent with the present claim of the appellees. At a meeting held at the office of the company on November 8, 1943, about two weeks after Niner died, attended by Evans, one of the administrators, his counsel, two friends of Niner, and Miss Buchanan, she did not then assert the claim of herself and Downs to the business. Her explanation is a plausible

one: that at that time she was confident that there would be found among Niner's papers a will carrying into effect the terms of the agreement. The claim was asserted as soon as she was advised that Niner's safe deposit box had been opened and no such papers found.

The other evidence relied on by the appellants was the evidence of Burke, an employee of The J. C. Niner Company since 1939, who testified that in December, 1943, after Niner's death, Miss Buchanan told him that the committee had decided to give her and Downs the first preference to purchase the company, that Downs might decide not to put up any money and that, in that event she was going to purchase the company herself.

Miss Buchanan's version of this conversation is quite different. It is as follows: "Mr. Downs was on the phone; we waited until he had finished, and I said to Mr. Burke that we wanted him to know that we had turned the matter over to attorneys for settlement; that we felt that we had waited long enough for any papers to be found, and since none had been found it would have to be settled legally. And I also told him at that time that Mr. Evans had said that the committee had agreed that they would allow Mr. Downs and myself the first opportunity of buying the business if we wished it. Mr. Burke said 'Does that leave me out?' I said, 'well, not necessarily, because we don't know yet how it will be settled.' Mr. Burke asked me whether or not I would buy it if Mr. Downs wasn't interested; and I said that that was a matter to be taken up after it had been settled."

There is much testimony in the record pertaining to the character and quantity of the services rendered by both of the appellees. However, it is unnecessary to review it in detail as the right to a decree is not dependent thereon. The pertinent questions are whether there was an agreement, certain and definite in its terms and affirmatively established by clear and convincing testimony, and whether there was faithful performance on the part of the appellees. *Wilkins v. Anderson*, 172 Md. 700, 191 A. 433.

In *Miller's Equity Procedure,* par. 679, page 785, it is stated: "With respect to the essential ingredients of a contract sought to be specifically enforced it is said that no rule is better established than that every agreement to merit the interposition of a court of equity in its favor, must be fair, just, reasonable, bona fide, certain in all its parts, mutual, useful, made upon a good or valuable consideration not merely voluntary; consistent with the general policy of a well regulated society and free from fraud, circumvention, or surprise, or at least such an agreement must, in its effect, ultimately tend to produce a just end."

We are not unmindful of the general rule, as stated in 106 A. L. R. 748, that a proceeding for the specific enforcement of a contract to devise or bequeath the property of the promisor, being an effort, by a contract resting in parol, to distribute the estate of a deceased person in a different way from that provided by law, has uniformly, together with the evidence relied upon to establish the contract, been looked upon with jealousy, and the evidence to establish it will be weighed in the most scrupulous manner.

Recognizing this rule this Court has said in *Neal v. Hamilton,* 159 Md. 447, at page 449, 150 A. 867, at page 868: "The disfavor with which the court regards an oral agreement for services which are to be compensated after the promisor's death by devise and bequest, and the necessity that the terms of such a contract be not only certain and definite, but be also affirmatively established by clear and convincing testimony, are based upon weighty practical considerations and grounded in a wise policy which should be consistently followed. *Mundorff v. Kilbourn,* 4 Md. 459; *Soho v. Wimbrough,* 145 Md. 498, 510, 125 A. 767; *Semmes v. Worthington,* 38 Md. 298, 318. Where, however, the conditions imposed upon the plaintiff are met, as in the instant case, the rule is not relaxed, but enforced, by the determination that such a contract was made."

472

Applying these rules to the present case we feel that the evidence, much of which we have quoted, clearly establishes the formation of the contract and that the contract, so proved by direct and corroborative testimony, is certain and definite in its terms, fair, just and reasonable, and founded upon a valuable consideration. And it is undisputed that the appellees have fully performed all their obligations under the contract.

It is contended by the appellants that the services rendered by the appellees are not referable to the contract to give them the business at Niner's death but that they were performed in the ordinary course of their employment and that the appellees have been fully compensated therefor. With this contention we do not agree, but we think that the matter is immaterial. The contract in this case deals entirely with personal property and not with real estate, and it is in cases dealing with oral contracts with respect to real property, which are invalid under the fourth section of the Statute of Frauds, that courts have announced the rule that in order to be entitled to specific performance of the contract the services performed by the claimant must be clearly referable to it. 69 A. L. R. 126; 106 A. L. R. 757.

But if the contract were within the Statute of Frauds, we feel that the actions of Miss Buchanan and Downs, in leaving positions of secure employment to enter a competing business, with the hazards in connection therewith, and in performing services greatly in excess of those expected of ordinary employees, were acts of performance, under the circumstances, consistent with and referable to the contract now sought to be enforced. And this court has said in *Neal v. Hamilton,* supra, 159 Md. at page 451, 150 A. at page 869: "While the performance of ordinary services will not take an oral contract out of the statute of frauds, if the value of such services can be ascertained with reasonable accuracy in an action at law and adequately compensated by a recovery of damages, yet, where it is impossible to restore the plaintiff to his original position by any legal remedy, the essential condition of

equity jurisdiction in case of part performance is fulfilled, and the rendition of the services will take the parol contract out of the statute of frauds. See *Browne on Statute of Frauds,* Secs. 273-276, 438, 452, 463. The distinction is well expressed by *Pomeroy on Specific Performance* (3d Ed.), Sec. 114: 'But if the services are of such a peculiar character that it is impossible to estimate their value by any peculiar standard, and it is evident that the parties did not intend to measure them by any such standard, then the plaintiff, after the performance of these services, could not be restored to the situation in which he was before, or be compensated by any recovery of legal damages.' "

Certainly in this case the appellees cannot be restored to the positions in which they were before the formation of the contract. And a natural inference to be drawn from the testimony is that a part, at least, of the success of The J. C. Niner Company, was due to the faithful and loyal services of the appellees, services rendered by them, not only as employees, but as the eventual owners of the business. Under the circumstances, as was said in *Neal v. Hamilton,* supra, "anything short of a performance would be inequitable."

The only exceptions to testimony pressed by the appellants in this Court were those relating to the refusal of the Chancellor to allow the witnesses, Morgan and Burke, to testify as to certain statements made to them by Niner out of the presence of the appellees relating to the character of the services performed by the appellees. These were self-serving declarations. And the rule is well established that declarations of a party favorable to himself are not admissible unless made in the presence of the other party or as a part of the *res gestae,* or in contradiction of evidence previously given. *Jones v. Dugan,* 124 Md. 346, 92 A. 775; *Takoma Park Bank v. Abbott,* 179 Md. 249, 19 A. 2d 169. It is stated in 20 Am. Jur., *Evidence,* par. 558, page 472, that a few courts hold that self-serving declarations are admissible to rebut disserving declarations, and the case of *Bowie v. Stonestreet,*

6 Md. 418, 61 Am. Dec. 318, is cited as authority. But this case holds only that if the declarations or admissions of a party are to be used for a purpose adverse to his claim, those made at the same time which are in his favor must be also received. We feel that the Chancellor was correct in refusing to admit this testimony. However, even if it had been admitted, it could not have changed the conclusion properly reached by the Chancellor that the contract was entered into between the appellees and Niner and that it possessed the necessary characteristics to merit its specific performance by a court of equity.

The decree appealed from must, therefore, be affirmed.

*Decree affirmed, with costs.*