HANSON *v.* URNER, CO-EXECUTOR ET AL.

[No. 86, October Term, 1954.]

*Decided February 18, 1955.*

*Motion for clarification and rehearing filed March 8, 1955; clarification granted and opinion modified and rehearing denied March 16, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Bernard M. Savage* and *E. Stuart Bushong,* with whom was *Irving Schwartzman* on the brief, for the appellant.

*Francis H. Urner,* with whom was *D. K. McLaughlin* on the brief, for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was brought in the Circuit Court for Washington County by Mrs. Mary Katherine Heggan Hanson, of Baltimore, against the executors of the estate of Lora A. Hammaker, deceased, and certain beneficiaries named in her will to obtain specific performance of an oral contract by which the testatrix agree to leave certain real and personal property to complainant on condition that she would come to Hagerstown and serve as her housekeeper and nurse as long as she lived.

Complainant is not related to the testatrix; she had married a son of the testatrix but had been divorced. During the period between September, 1944, and March, 1946, when the testatrix was suffering with high blood pressure, myocardia degeneration, colitis and other ailments, complainant came to Hagerstown on week-ends about once or twice a month to stay with the testatrix and to help her with her household duties. On April 6, 1946, the testatrix was seized with a heart attack, and she asked Mrs. Ruth Irene Hook, whom she had known for some years and who often came to see her, to phone complainant and urge her to come to Hagerstown at once to help her. In compliance with the urgent appeal, complainant came to the home of the testatrix on April 7, and immediately entered upon the duties of housekeeper and nurse.

Complainant alleged that the testatrix promised to leave her the Potomac Edison Building on East Washington Street in Hagerstown and also her diamond ring in consideration for her services. She alleged that during the following three years and a half, with the exception of occasional visits to Baltimore, she devoted practically all of her time to the work of housekeeper and nurse; but that in October, 1949, the testatrix struck her with a chair, kicked her, threatened her with bodily harm on other occasions, called her vile names, and refused to allow her to enter the home by having the locks changed on the doors.

Complainant was prevented from testifying by the Evidence Act, which provides that in actions or proceedings by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as, such, in which judgments or decrees may be rendered for or against them, no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator or intestate, unless called to testify by the opposite party, or unless the testimony of such testator or intestate shall have already been given in evidence. Code 1951, art. 35, sec. 3; *Price v. McFee,* 196 Md. 443, 77 A. 2d 11; *Ewell v. Landing,* 199 Md. 68, 85 A. 2d 475. However, complainant produced a number of intimate friends of the testatrix, who testified to declarations of the testatrix concerning the contract.

Mrs. Hook testified that the testatrix informed her about a week or two before. she was stricken with her heart attack that she had made her will and had left the Potomac Edison Building to complainant. She recalled that the testatrix had remarked that "she had asked Cassie (the name by which Mary Katherine was familiarly known) to remain by her side, and she knew she could depend on Cassie as long as she lived." She added that Cassie said "Yes" to the offer of the testatrix. She further testified that the testatrix told her about a dozen times afterwards that complainant would get the build-

ing. "It was like a repeating record," the witness said, "because it was really tiresome to listen to it."

Dr. Samuel Robert Wells, who had been the testatrix's physician for at least ten years, testified that in December, 1945, she asked him what he thought of her idea of trying to get Cassie to come and stay with her. He told her: "Yes, I think you should have somebody with you, and I think it would be a big help to you, and I think you need it." The doctor also definitely testified that the testatrix told him: "I am going to leave Cassie the Potomac Edison Building if she will come and stay with me and she will take care of me." He further testified that a short time later she told him that she had made her will and left the Potomac Edison Building and her diamond ring to complainant.

Mrs. Naomi Hearon, who had known the testatrix for 40 years and had often visited her, testified that the testatrix told her that she wanted Cassie to stay with her all the time. Mrs. Hearon also recalled that the testatrix stated that she was not paying complainant any salary, but had arranged to take care of her later.

The testimony of these and other witnesses indicating that the testatrix had made a definite agreement with complainant was buttressed by the introduction into evidence of a copy of a will made by the testatrix on March 14, 1946, which left the Potomac Edison Building and her jewelry to complainant. A carbon copy of the will was produced by Edward Oswald, Jr., who had been the testatrix's attorney for many years.

On October 31, 1947, the testatrix made a codicil reaffirming the devise of the Potomac Edison Building and the bequest of the jewelry to complainant. A carbon copy of the codicil was likewise produced by Mr. Oswald and identified by him.

It appears from the evidence that complainant performed the duties of housekeeper and nurse for the testatrix from April, 1946, to October, 1949. She bought and cooked the food, washed and ironed, and kept the house clean. She also performed the duties of a nurse. In

telling about those duties Dr. Wells testified as follows: "She gave Mrs. Hammaker her medicine, looked after her, helped her to the bathroom, kept her clean, washed her, kept her bed clean, * * * saw that she had food, gave her medicine right along."

As time went on complainant's duties became increasingly arduous and disagreeable. Dr. Wells stated that the testatrix was a "difficult person," and that in the fall of 1948 she began to deteriorate mentally. He stated that she was afflicted with hysteria. This is a psychoneurotic disorder characterized by extreme emotionalism involving disturbance of the psychic, sensory, motor, vasomotor and visceral functions, and by anxiety, exaggeration of the effects of sensory impressions and various other morbid effects due to autosuggestion. By the middle of January, 1949, according to the doctor, the testatrix would often become delirious and "would see things in the windows and the walls, and claim that somebody was trying to get in, and she would have locks on her doors, instead of one lock she would have two padlocks." The doctor gave the following description of her condition:

> "She got so that she was hilarious and she would yell, she would walk around, stagger around through the house, beat things with her cane, the walls and doors. She tried to jump out of the front window there, until they had to nail those down, and she would just be in one room, and be yelling, the first thing you knew she would get up and stagger over to another room beating on the wall over there. * * * One time she told me that the angels were boring holes through the ceiling and throwing nickels in, and I was stealing the nickels; and then another time she accused me of stealing her nails. She had a keg of nails down the hall underneath in a cupboard."

Early in February, 1949, the testatrix's condition had become so wretched that it was impossible to take care

of her in her home any longer. On February 7 she was taken to Riggs Cottage Sanitarium at Ijamsville. The Circuit Court adjudicated her mentally incompetent, and complainant was appointed her trustee.

Within a few months the testatrix demanded that she be released from the sanitarium, and her request was granted on April 29, 1949. After she was brought back to Hagerstown, she turned against complainant and also against Dr. Wells, her physician, Mr. Oswald, her attorney, and other friends.

In October, 1949, the testatrix petitioned the Court for a hearing to enable her to show that she had recovered her sanity. On October 26 complainant tendered her resignation as trustee, and refrained from making any effort to prevent the testatrix from being declared mentally competent. On October 27, after a jury found that the testatrix was of sound mind and capable of executing a valid deed or contract, the Court signed a decree declaring the testatrix to be mentally competent and capable of managing her person and estate.

Complainant called attention to the fact that on November 1, 1949, only five days after the testatrix was declared mentally competent, she extended the lease of her building to the Potomac Edison Company for the term of ten years with the right of the lessee to renew the lease for twenty additional years at the same rental.

The testatrix died only July 7, 1952. On July 15, 1952, the Orphans' Court of Washington County probated a will, executed by the testatrix on June 30, 1950, which made no provision whatever for complainant, but appointed Francis H. Urner and Olive E. Martin as executors with authority to sell the Potomac Edison Building at either public or private sale and to use the proceeds of sale for the payment of the various bequests contained in the will.

The law is settled in this State that an oral contract to make a will devising an interest in land is within clause 4 of the fourth section of the Statute of Frauds, and is unenforceable unless the bar of the Statute is removed, as it may be by proof that the person asserting

the contract has performed it in part and is willing and able to do. those things which she undertook to do under it. While the performance of ordinary services will not take an oral contract out of the Statute of Frauds if the value of such services can be ascertained with reasonable accuracy in an action at law and adequately compensated by an award of damages, yet where it is impossible to restore the complainant to his original position by any legal remedy, the essential condition of equity jurisdiction in case of part performance is fulfilled, and the rendition of the services will take the oral contract out of the Statute. Thus a contract to devise real property, if shown to be fair. and reasonable and founded upon sufficient consideration, may be specifically enforced by means of a conveyance as against the heirs or devisees of the party who obligated himself to devise. Equity assumes purisdiction in such a case to prevent an injury amounting to a fraud, where it is shown by clear and convincing evidence that it is impossible to restore the parties to their original position. *Fitzpatrick v. Michael,* 177 Md. 248, 9 A. 2d 639; *Mannix v. Baumgardner,* 184 Md. 600, 42 A. 2d 124.

*Neal v. Hamilton,* 159 Md. 447, 150 A. 867, is a case in point. In that case there was testimony that the deceased had orally agreed to pay the complainant a small monthly salary, which was less than the salary she had been earning, and to leave her his property in consideration for her promise to leave her employment in another State and to serve as his housekeeper and companion. It was there held by this Court that the rendition of the services for the deceased was sufficient part performance to take the oral contract out of the Statute of Frauds for the purpose of the suit for specific performance, as the services were of such a peculiar character that it was impossible to estimate their value by any monetary standard, and the contract was one for the breach of which there was no practicable measure of damages.

In the case before us the chancellor was satisfied that complainant had spent most of her time in the home of

the testatrix and had performed many services for her until October 1949, when she was expelled from the home. He did not question that the testatrix had told the witnesses on many occasions that she was going to leave the Potomac Edison Building to complainant. He was also certain that complainant had hopes and expectations of receiving reward for her services. But he observed that none of the witnesses who appeared in the case testified to any promise made by the testatrix to complainant in their presence, and for that reason he did not think the evidence was sufficient to prove that a contract had been made. Hence, on July 23, 1954, he signed a decree dismissing the bill of complaint. From that decree complainant appealed to this Court.

It is undeniably true that the courts look with disfavor upon an oral agreement for services which are to be compensated for after the promisor's death by devise or bequest. *Evans v. Buchanan*, 183 Md. 463, 38 A. 2d 81. The rule that the terms of such a contract must be certain and definite and must be affirmatively established by clear and convincing testimony is grounded in wise policy. Especially in a case for the specific performance of a contract to devise real property where it has been devised to someone else, the utmost certainty of proof is required, because, as it was pointed out by Judge Alvey in *Semmes v. Worthington*, 38 Md. 298, 318, "by the enforcement of the contract, the court undertakes to set aside a solemn testamentary act of the deceased party, in the absence of all possible explanation of his conduct, and when he is no longer present to vindicate himself against the imputation of bad faith." Obviously the contract in such a case cannot be established by evidence of declarations of the testator to mere strangers to the transaction in chance conversations, which the witnesses had no reason to recollect from interest in the subject matter, and which may have been imperfectly heard or inaccurately remembered.

However, where the conditions imposed upon the complainant are met, the court of equity will not hesitate

to decide that such a contract was made. Moreover, the rule is thoroughly understood that an oral contract to devise real property in consideration of services rendered may be established by parol evidence of witnesses who were not present at the making of the contract. *Loney v. Loney*, 86 Md. 652, 38 A. 1071; *Ford v. Young*, 225 Iowa 956, 282 N. W. 324, 327.

This rule was recognized by the United States Supreme Court in *Brown v. Sutton*, 129 U. S. 238, 9 S. Ct. 273, 274, 32 L. Ed. 664. The issue in that case was whether John S. Kenyon, deceased, had made an oral contract to give his house to Mrs. Sutton, the complainant, who had ministered to his many senile wants and had nursed his wife in her last illness. Complainant and her husband were living in Mr. Kenyon's house at the time of his death. The title to the house was still in Mr. Kenyon's name, but several witnesses testified to his statements that he had bought the house for complainant in consideration of her past and future services. The Court held that, although the most direct testimony came from complainant's sister and brother-in-law, yet, since they were not impeached, the oral promise was sufficiently proved.

Justice Miller, who delivered the opinion of the Court in that case, gave the following explanation of his reliance upon the testimony:

"As Mrs. Sutton was not competent as a witness to establish a promise on the part of Mr. Kenyon to convey the property to her, * * * and as Mr. Sutton, being her husband, was also incompetent, it can be readily seen, in the absence of any written agreement upon the subject or any correspondence between the parties, which could not reasonably be expected to exist, as they were nearly always living together, that it is almost impossible to prove a direct verbal promise from Mr. Kenyon to her in regard to that matter. Any such promise must be largely inferred from the situation and circumstances

of the parties, and must depend almost wholly on verbal statements made by Mr. Kenyon to others."

Of course, in order to prove such an oral contract, the evidence must establish that the minds of the parties met upon definite terms. It is not sufficient to show merely that the statements and the conduct of the decedent raised the hopes and expectations of the complainant. However, in the instant case it is entirely clear that, while the purpose of the testatrix to leave the Potomac Edison Building and the diamond ring to complainant is not of itself sufficient to constitute a contract, the execution of the will in 1946 carrying out that purpose and the execution of the codicil in 1947 reaffirming the devise and bequest are consistent with complainant's allegations and with the testimony of the witnesses that the testatrix offered to leave the building and the ring to complainant and that complainant accepted the offer.

In addition, sufficient consideration for the promise of the testatrix can be found in complainant's promise to render services for the testatrix as long as she lived. The rendition of the services by complainant cannot be reasonably accounted for except on the theory of a promise by the testatrix and reliance thereon by complainant, who left her apartment in Baltimore to undertake arduous work in Hagerstown for a suffering woman to whom she was not related.

For these reasons we are convinced that complainant met the burden of proof by showing that she had entered into a contract to render services for the testatrix and had faithfully performed them until the testatrix breached the contract without justification. We must therefore reverse the chancellor's decree dismissing the bill of complaint and remand the case for the passage of a decree specifically enforcing the contract.

*Decree reversed and case remanded for the passage of a decree in accordance with this opinion, the costs to be paid out of the estate of the testatrix.*