# United States Court of Appeals
## For the First Circuit

No. 00-1748
No. 00-1749

WILLIAM R. FENOGLIO,

Plaintiff, Appellee/Cross-Appellant,

v.

AUGAT INC. and THOMAS & BETTS CORPORATION,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,

Bownes, Senior Circuit Judge,

and Lipez, Circuit Judge.

Scott E. Williams with whom Jonathan P. Graham and Williams & Connolly LLP were on brief for defendants.
Michael A. Avery, Suffolk University Law School, with whom Matthew J. Tuttle and Perkins, Smith & Cohen, LLP were on brief for plaintiff.

June 27, 2001

BOUDIN, Chief Judge. In this case, both sides appeal from the decision of the district court. The dispute concerns the extent of payments due from a corporate employer to its former chief executive officer. The difficult issue on appeal is whether the executive was entitled to receive benefits under a "change-in-control" contract. The underlying facts are largely undisputed. We reprint pertinent provisions of the contracts in question in an appendix to this opinion.

On August 29, 1994, William Fenoglio signed an employment contract with Augat Inc., an electronics manufacturing firm in Mansfield, Massachusetts. As provided for in the contract, Fenoglio became chief executive officer ("CEO") on January 1, 1995, and was appointed to Augat's board of directors. The contract also promised Fenoglio a base salary, bonuses, fringe benefits, and stock options. The contract stated that "employment . . . shall terminate . . . [a]t the election of either party, upon not less than six months' prior written notice of termination," and provided for a severance payment after termination.

Pertinently, Augat promised to pay Fenoglio "the compensation which would otherwise be payable" for twelve months from "the date of termination of his employment." This sum was to be reduced by any payments made pursuant to provisions in a

-3-

separate change-in-control contract. This second contract promised Fenoglio substantial compensation in the event that Augat were to be acquired by another company and Fenoglio were "terminated within 36 months after Change in Control . . . other than for Cause or Disability."

At a July 16, 1996, meeting, Augat's board of directors voted to terminate Fenoglio. This was a policy decision by the board; there is no claim that Fenoglio was discharged "for cause." John Lemasters, the board chairman who immediately replaced Fenoglio as interim CEO, told Fenoglio of the board's decision that evening. Fenoglio was also shown a copy of a press release stating briefly that he had "resigned" as CEO. Fenoglio performed no further work for the company after that date.

In late July, Fenoglio wrote Augat a letter asking about his severance. In a reply letter dated August 6, 1996, Lemasters outlined Augat's understanding of its obligations, contingent upon Fenoglio's "timely agreement" thereto. The letter concluded by saying that it "serve[d] also as notice of termination of all other contracts" between the parties "including the September 6, 1994 Change in Control Agreement."

-4-

Two months later, on October 7, 1996, Augat's board agreed that the company would be acquired by Thomas & Betts Corp. The merger was consummated on December 11, 1996, when Augat became a wholly owned subsidiary of Thomas & Betts. The companies refused, however, to pay Fenoglio change-in-control benefits because they said that Fenoglio had been terminated before the merger. On January 3, 1997, Fenoglio filed suit against Augat and Thomas & Betts in federal district court, alleging breach of both the employment and change-in-control contracts.

One such allegation was that the companies had breached the employment contract by failing to honor Fenoglio's stock options. Later, while the lawsuit was pending, Fenoglio wrote to the companies (on May 20 and June 30, 1997) seeking to exercise these options. When the companies refused, Fenoglio amended the complaint to add allegations that Augat and Thomas & Betts had committed securities fraud under federal and Massachusetts law by misrepresenting the exercisability of his options.

The district court granted summary judgment for Fenoglio on certain claims, awarding him benefits under the change-in-control contract and five of six disputed lots of stock options. Fenoglio v. Augat, Inc., 50 F. Supp. 2d 46, 56-

-5-

57 (D. Mass. 1999). The companies prevailed on summary judgment as to the sixth stock option agreement and as to the securities fraud claims, which the district court dismissed. Id. at 56 n.9, 58-59. Fenoglio was awarded just under $3 million plus prejudgment interest of more than $1 million. The companies now appeal as to the award of change-in-control benefits and stock options; Fenoglio cross-appeals only to challenge the district court's ruling that one set of stock options had already expired.

Our review is de novo as to the grant of summary judgment, inferences being drawn against whichever party succeeded on the respective motion. Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996). Contracts are ordinarily construed by the court "as a matter of law" unless there are disputes as to extrinsic facts that bear on interpretation. Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000). We begin with the issue of the change-in-control benefits.

Whether Fenoglio is owed change-in-control benefits depends on how one reads the language of two different contracts. If the change-in-control contract were taken alone, the most straightforward reading favors the companies. It pertinently provides that "[i]f your employment is terminated

-6-

for any reason and subsequently a Change in Control shall have occurred, you shall not be entitled to any benefits hereunder." And, as the companies point out, Fenoglio was terminated in the ordinary sense of the term--albeit without the six months' notice promised by the employment contract--either in July or August 1996, well before anyone claims that a change in control occurred.[1]

Nor is Fenoglio helped much if one looks at purpose--a common interpretive aid, Restatement (Second) of Contracts § 202(1) & cmt. c (1981)--if attention is limited to the change-in-control contract. The purpose of "golden parachute" provisions like this one is primarily to assure the loyalty of a high-level employee in the face of a possibly hostile change in control. See Campbell v. Potash Corp., 238 F.3d 792, 799-800 & nn.4-6 (6th Cir. 2001). But Fenoglio was fired by the existing board, and there was no takeover, hostile or otherwise, until after he had been fired.

_____

[1]The factual scenario might itself be open to interpretation, and, to that extent, we are giving the companies the benefit of the doubt on a summary judgment issue resolved against them. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997). The reason for the doubt is that the events on July 16 look at first blush like an immediate discharge, but conceivably, Fenoglio could argue that he was merely removed as chairman and left as an employee without duties for six months from that date, or, alternatively, from receipt of LeMasters' August 6, 1996, letter.

There is a possible qualification: if Fenoglio had been fired in anticipation of a change in control, he might argue that a denial of change-in-control benefits would frustrate the aim of that contract (if not its literal language); and perhaps he could make a case based on an implied covenant of good faith and fair dealing. Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1256-58 (Mass. 1977). But Fenoglio does not claim that he was fired as a "housecleaning" measure, in the shadow of a takeover, in order to avoid paying him change-in-control benefits after the takeover. If that claim was supportable, it seems certain that counsel would have made it.

If one turns to the employment contract, Fenoglio's position improves. This is not because Fenoglio is entitled to change-in-control benefits as consequential damages traceable to the breach of the employment contract's notice provision. He might have such a claim, but he has not made it, presumably because he does not want the added burden of satisfying the foreseeability requirement that exists when damages go beyond what was promised in the contract (e.g., salary) to other unspecified consequences, see Am. Mech. Corp. v. Union Mach. Co., 485 N.E.2d 680, 683-84 (Mass. App. Ct. 1985).

Rather, Fenoglio's best case on this record turns on using the employment contract to determine when Fenoglio was terminated for purposes of the change-in-control contract. Despite the companies' claim that the latter is an integrated document, we (like the district court, 50 F. Supp. 2d at 56-57) see no difficulty in reading the two documents together. The reason is that the change-in-control contract itself contemplates an employment relationship defined elsewhere; and the pertinent "elsewhere" is the employment contract read in light of state law. See Wilmot H. Simonson Co. v. Green Textiles Assocs., 755 F.2d 217, 219-20 (1st Cir. 1985); Chelsea Indus., Inc. v. Florence, 260 N.E.2d 732, 735-36 (Mass. 1970).

The employment contract is written in terms quite helpful to Fenoglio. It does not merely promise that Augat will provide six months' notice, although this might be enough under some case law.[2] Rather, it says that "employment . . . shall terminate upon . . . not less than six months' prior written notice of termination." If, as the language suggests, this statement defines Fenoglio's employment status, then whether this notice was delivered in July or August 1996, he was

---

[2]See, e.g., Markovits v. Venture Info. Capital, Inc., 129 F. Supp. 2d 647, 650, 654-55 (S.D.N.Y. 2001); Hepner v. Am. Fid. Life Ins. Co., 258 S.E.2d 508, 509, 511-12 (Va. 1979); cf. Nat'l Med. Care, Inc. v. Zigelbaum, 468 N.E.2d 868, 872-73 (Mass. App. Ct.), rev. denied, 471 N.E.2d 1354 (Mass. 1984).

still an employee--albeit banished as CEO--when the change in control occurred in December.

Contrary to the companies' assertions, it is clear to us that the district judge relied on this contractual language to determine the date of termination rather than on arguably inadmissible (under Fed. R. Evid. 408) language from the August 6, 1996, letter ("Although you have resigned as President and CEO effective July 16, 1996, Augat will pay your current compensation and benefits through your date of termination on January 16, 1997."). See 50 F. Supp. 2d at 53 n.5. The district court merely considered the letter as supplying the required notice, relying on a part of the letter that is not even arguably reached by Rule 408.

Of course, it is quite likely that the situation that has arisen here was not foreseen by the parties. And where language is ambiguous, courts often make their own best guess as to how reasonable parties would deal with unanticipated applications, e.g., Fleet Nat'l Bank v. H & D Entm't, Inc., 96 F.3d 532, 538-39 (1st Cir. 1996), cert. denied, 520 U.S. 1155 (1997), or rely upon mechanical canons of interpretation.[3] But

[3]Pertinent here is the contra proferentem canon, that is, that uncertainties should be resolved against Augat, the drafter of the contract. See Merrimack Valley Nat'l Bank v. Baird, 363 N.E.2d 688, 690-91 (Mass. 1977); Aldrich v. Bay State Constr. Co., 72 N.E. 53, 54 (Mass. 1904). How much force should be

-10-

literal language favors Fenoglio once the two contracts are read together, and it is hard to see why literal language should not be followed where, as here, the result is hardly absurd or unfair. Indeed, a company that drafts a notice requirement like this one might deem itself lucky when the executive leaves office at once and without fuss.

This does not mean that Fenoglio could have obtained an injunction requiring the Augat board to let him remain as chief executive officer after he had lost the confidence of the board; there are public policy reasons why a court would be likely to refuse such relief. Restatement (Second) of Contracts § 367(1) & cmt. a (1981); Fitzpatrick v. Michael, 9 A.2d 639, 641 (Md. 1939). But that is no reason why the more general commitment to treat him as an employee for six months after notice should not be given effect insofar as it affects merely financial entitlements.

The remaining issues in the case concern whether the stock options were exercised within the required time periods, a matter resolved as to five of six option grants at issue in Fenoglio's favor. The district court's treatment, 50 F. Supp.

---

given to such a canon where the contract is between two sophisticated parties is open to doubt. Principal, 233 F.3d at 4; RCI Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 203 n.3 (1st Cir. 1987).

2d at 54-56, was thorough and persuasive, and we adopt its discussion as to the companies' appeal. We turn, then, to Fenoglio's cross-appeal; there, Fenoglio objects to the denial of benefits under the December 20, 1994, options contract.

The problem in a nutshell is that Fenoglio was required, under the terms of this contract, to exercise his options within three months of termination of employment. An alternative, longer period that the district court held applicable to other options did not even arguably apply to the December 20 contract. 50 F. Supp. 2d at 55 n.6. Fenoglio formally attempted to exercise his options under this last contract only on May 20, and June 30, 1997.

This attempted exercise came more than three months after the last date on which Fenoglio could plausibly claim employee status. Even if one took the latest plausible date of Fenoglio's purported termination (the August 6, 1996, letter), treated it merely as notice, and then gave him the further benefit of the six months' notice period, this would still only take him to February 6, 1997. His earliest letter seeking to exercise the December 20 options was sent on May 20, 1997. Thus, he falls outside the three months' exercise period explicitly provided.

On appeal, Fenoglio says that it would have been futile to exercise the December 20 options because the companies would not have honored them. Courts sometimes do excuse failures to give notice or take similar acts where notice would plainly be futile. E.g., Pupecki v. James Madison Corp., 382 N.E.2d 1030, 1034 (Mass. 1978); Trustees of the Boston & Maine Corp. v. Mass. Bay Transp. Auth., 323 N.E.2d 870, 873 n.2 (Mass. 1974). However, there is no evidence here that the purported exercise would have been futile. Fenoglio relies on an out-of-context statement by the district court, see Fenoglio v. Augat, Inc., Civ. Action No. 97-10012-PBS, slip op. at 3 (D. Mass. Mar. 16, 2000); this statement was not directed to the futility doctrine and would not, in any event, substitute for the lack of proof.

Fenoglio's other argument is that the companies should be estopped from denying that Fenoglio was an employee after the six months' notice period because, for a substantial additional period (until April 25, 1997), it gave him pay and certain other benefits as if he were an employee. As the district court properly found, 50 F. Supp. 2d at 53, these later payments were post-employment severance payments promised by contract. They did not constitute representations of continued employment status sufficient to ground an estoppel claim.

The judgment of the district court is affirmed.

-13-

**APPENDIX**

Employment Contract (§§ 4 & 5)

4. <u>Employment Termination</u>. The employment of the Employee by the Company pursuant to this Agreement shall terminate upon the occurrence of any of the following:

. . . .

4.4 At the election of either party, upon not less than six months' prior written notice of termination.

5. <u>Effect of Termination</u>.

5.1 <u>Termination for Cause or at Election of Either Party</u>. . . . In the event the Employee's employment is terminated . . . at the election of the Company pursuant to Section 4.4, the Company shall pay the Employee the compensation which would otherwise be payable to the Employee up to the last date to occur of (a) three years from the Commencement Date [September 6, 1994] or (b) twelve months from the date of termination of his employment. Any payments to the Employee pursuant to the preceding sentence shall be reduced by any payments made to the Employee pursuant to Section 4(c)(i) of the Employee's Change of Control Letter Agreement dated September 6, 1994 with the Company.

Change-in-Control Contract (§ 3)

3. <u>Employment Status; Termination Following Change in Control</u>.

(a) This Agreement does not constitute a contract of employment or impose on the Company any obligation to retain you as an employee. This Agreement does not prevent you from terminating your employment at any

-14-

time.  If your employment is terminated for any reason and subsequently a Change in Control shall have occurred, you shall not be entitled to any benefits hereunder.  Any termination by the Company or by you following a Change in Control of the Company during the Term shall be communicated by written notice of termination ("Notice of Termination") to the other party hereto in accordance with Section 6.  The "Date of Termination" shall mean the effective date of such termination as specified in the Notice of Termination.

(b) Notwithstanding anything to the contrary herein, you shall be entitled to the benefits provided in Section 4 only if any of the events constituting a Change in Control of the Company shall have occurred during the Term and your employment with the Company is terminated within 36 months after such a Change in Control of the Company . . . .

4.   Compensation Upon Termination.  If (i) any of the events constituting a Change in Control of the Company shall have occurred during the Term and (ii) your employment with the Company is terminated within 36 months after such Change in Control of the Company, you shall be entitled to the benefits set forth in this Section 4:

. . . .

(c) If your employment by the Company should be terminated by the Company other than for Cause or Disability or if you should terminate your employment for Good Reason, then you shall be entitled to the benefits below:

(i) the Company shall pay you your full base salary and all other earned or accrued compensation through the Date of Termination at the rate in effect at the

time the Notice of Termination is given, plus all other amounts to which you are entitled under any compensation plan of the Company at the time such payments are due and, in lieu of further salary payments for periods subsequent to the Date of Termination, the Company will pay you a lump sum cash payment as severance pay . . . .