**Ashok K. SHAH, Plaintiff,**

v.

**NU–KOTE INTERNATIONAL, INC., a Delaware Corporation, Defendant.**

No. 94–CV–75189–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 18, 1995.

Katherine W. Shensky, Bloomfield Hills, Michigan, for plaintiff.

David H. Oermann, Detroit, Michigan, for defendant.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Ashok Shah, a Michigan resident, brought this action against Defendant Nu–Kote International, Inc. ("Nu–Kote") on December 30, 1994. Nu–Kote is a Delaware corporation which, during the relevant time period, maintained its principal place of business in Rochester, New York. Nu–Kote sells office supplies in Michigan and across most of the United States. Shah was employed by the company from September 1987 through at least October 31, 1988. Subject matter jurisdiction in this Court in premised on diversity of citizenship. 28 U.S.C. § 1332(a)(1). Discovery is incomplete.

In his complaint, Plaintiff alleges that Nu–Kote breached its employment contract with him by denying him the opportunity to purchase 25,000 shares of company stock at one dollar per share. Nu–Kote filed the instant motion to dismiss or for summary judgment on March 24, 1995. Plaintiff responded on May 2, and Defendant replied on May 15.

Defendant states three grounds for dismissal or summary judgment. First, it argues that it is not subject to the personal jurisdiction of this Court. Second, it asserts that venue is improper. Finally, it contends that Plaintiff's claim is barred by Michigan's six-year statute of limitations for contract claims.

Having considered the documents filed by the parties, and having held a status conference in chambers on June 21, 1995, the Court is now prepared to rule on Defendant's motion. This memorandum opinion and order sets forth that ruling.

### II. FACTUAL BACKGROUND

Taken in the light most favorable to the Plaintiff, the record currently before this Court reveals the following. In the spring of 1987, while Plaintiff was working in Michi-

gan, he was actively recruited by Defendant to work at its Rochester headquarters. On June 4, 1987, Plaintiff was formally offered employment with Defendant as the North American Director of Product Assurance and Quality. Plaintiff held this executive position for approximately 13 months. During much of that time, with Defendant's permission, Plaintiff continued to reside in Michigan and perform some of his job duties here.

Because of Plaintiff's status as a senior executive with the company, in addition to more traditional forms of compensation, Plaintiff was told he would be given an option to purchase company stock. On June 4, 1987, Plaintiff received a letter from Defendant's Executive Vice–President Endre Vargha indicating that he could purchase up to 25,000 shares of common stock at $1.00 per share.[1] Although the company was struggling, Plaintiff believed it would eventually be successful, and viewed the option to purchase stock as an attractive benefit.

Two months after Plaintiff began working for Defendant, Plaintiff received a second letter from Nu–Kote's Executive Vice–President, dated November 17, 1987, in which he was told that if he wanted to purchase stock he needed to submit a $25,000 check by December 21. In response, Plaintiff tendered a check for $25,000. On January 6, 1988, however, the check was returned to him with a note indicating that Nu–Kote had decided not to issue stock at that time, and that a future stock offering was contemplated.[2] No additional offerings were made during Plaintiff's short tenure with the company.

Shortly thereafter, Plaintiff spoke with Ron Tischer, the company's President, about the rescission of the stock offer. Tischer assured Plaintiff that Plaintiff would be offered stock in the future, and told him not to worry. This assurance was reaffirmed by the company's Executive Vice–President.

On October 31, 1988, Plaintiff was formally notified that his position was being eliminated and his job terminated "effective as of that date" as part of a restructuring of the company. (October 31, 1988, letter from Endre Vargha, Nu–Kote Executive Vice–President, to Plaintiff). Plaintiff describes the termination as amicable and not based on job performance. As a severance package, Plaintiff was given nine weeks' pay to cover the period between October 31 and December 30, 1988, and continued to receive medical, dental and life insurance coverage, in addition to other employee benefits. However, his short and long term disability insurance coverages were eliminated. Whether or not Plaintiff would be eligible to exercise his stock option in the future was never specifically discussed, nor was this topic addressed in Defendant's formal termination letter to Plaintiff.

## III. ANALYSIS

### A. This Court has Personal Jurisdiction over Defendant.

Defendant argues that its contacts with Michigan are too minimal for general personal jurisdiction, and that Plaintiff's claim does not arise from Defendant's activities here, making limited personal jurisdiction unavailable as well. Defendant supports its claim with an affidavit signed by Anthony Schmeck, a company executive. Mr. Schmeck states that at all times relevant to the complaint, Nu–Kote maintained its principal place of business in Rochester, New York, that in 1987 Nu–Kote obtained certification to do business in Michigan, but never actively engaged in business in the state, and that Nu–Kote's only current contact with Michigan is its maintenance of a single employee here as a sales representative. The representative travels in Michigan and neigh-

---

1. Vargha wrote: "As part of the senior management team of Nu–Kote International, Inc. you will be given the opportunities to make investment in our Company. You may purchase up to 25,000 shares of common stock at $1.00 per share."

2. The letter stated, in part: "Nu–Kote is currently considering an offering of its equity in order to raise additional funds. It is contemplated that certain executives of Nu–Kote International will be offered stock in connection with that offering. We expect that if, at the time of such offering, you are an employee of Nu–Kote International, Inc. you will be offered stock in that offering." (January 6, 1988, letter from Arthur Hammond, Nu–Kote Vice President–Finance and Chief Financial Officer, to Plaintiff).

boring states to meet with customers; however, he is not authorized to accept orders.

Additionally, Defendant argues that the two events most closely associated with the alleged breach—the return of the $25,000 check on January 6, 1988, and the company's decision(s) not to issue stock to employees—both occurred in Rochester, New York, not Michigan.

 In diversity cases, a federal district court "must apply the law of the forum state to determine whether it may exercise jurisdiction over the person of a non-resident defendant. However, constitutional concerns of due process limit the application of this state law." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir.1991) (citations omitted). "The relevant inquiry is whether the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *accord Southern Machine Co. v. Mohasco Indus.*, 401 F.2d 374, 380 (6th Cir.1968)." *Id.* The Defendant's "conduct and connection with the forum State" must be "such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

 Personal jurisdiction in Michigan is governed by the Revised Judicature Act.[3] That Act distinguishes between "general" and "limited" (or "specific") personal jurisdiction.

In a case of general jurisdiction, a defendant's contacts with the forum state are of such a "continuous and systematic" nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state. *See, e.g., Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). In a specific jurisdiction case, "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Columbia [Colombia], S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984).

*Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989), *cert. denied*, 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); *see also Theunissen*, 935 F.2d at 1463 n. 4.

 However, this division between general and personal jurisdiction should not be rigidly applied. As noted above, the relevant inquiry is whether an assertion of jurisdiction over the Defendant "would comport with 'traditional notions of fair play and substantial justice.'" *Theunissen*, 935 F.2d at 1458. The more directly connected a particular plaintiff's cause of action is to the defendant's contacts with the forum state, the fewer contacts will be required. Conversely, the more remotely the cause of action is connected to forum contacts, the stronger those contacts will have to be. Only if the cause of action is entirely unconnected to the forum contacts must those contacts be continuous and systematic.[4]

---

3. M.C.L. §§ 600.701 and 600.705 govern personal jurisdiction over individuals; §§ 600.711, 600.715 govern corporations.

4. *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159–160, 90 L.Ed. 95 (1945):

It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the action, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less.... Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure....

[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state a procedure which requires the corporation to respond to a

### 1. General Personal Jurisdiction

Michigan courts may assert general jurisdiction over a corporation if it (1) is incorporated in the state, (2) has consented to state jurisdiction, or (3) carries on "a continuous and systematic part of its general business within the state." M.C.L. § 600.711. Plaintiff argues both that defendant carries on a "continuous and systematic part of its general business" within Michigan, and that it has consented to general jurisdiction by registering to do business in the state and appointing a resident agent (as required by M.C.L. § 450.1241).

In *Renfroe v. Nichols Wire & Aluminum Co.*, 348 Mich. 425, 83 N.W.2d 590 (1957), the Michigan Supreme Court held that a foreign corporation did not consent to personal jurisdiction for a cause of action arising outside of the state when it registered to do business in the state and appointed a resident agent for service of process. Thus, Defendant's decision to register in this state can only be construed as consent to be sued in Michigan for claims arising out of its business here.

■ Furthermore, in order to satisfy the "doing business" requirement of general jurisdiction, for purposes of both Michigan law and the Due Process Clause, the Defendant's connection to this state must be substantial. In *Helicopteros Nacionales de Columbia [Colombia], S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the mere purchase of helicopters from a Texas company, even though a series of purchases occurred at regular intervals, was not enough for the state to assert general jurisdiction over the foreign corporation when the cause of action was not related to those purchases.

"In this vein, the Court characterized the training of petitioner's pilots as 'part of the package of goods and services purchased' and thus not a significant contact on which jurisdiction could be based. In sum, the Court's dismissal of each of Helicopteros contacts as not significant, as well as its failure to consider the effect of the aggregate of those contacts, suggests very strongly that the threshold contacts required for general jurisdiction are very substantial, indeed." 4 C. Wright and A. Miller, *Federal Practice and Procedure* § 1067, at 297–98 (2d Ed.1987). However, Defendant need satisfy this requirement only if Plaintiff's cause of action is entirely unconnected to Defendant's contacts with this state.

### 2. Limited Personal Jurisdiction

■ Michigan's long-arm statute[5] has been interpreted to extend to the limits of due process. *Theunissen v. Matthews*, 935 F.2d 1454, 1462–63 (6th Cir.1991). The Court of Appeals for the Sixth Circuit has developed a three-part test for application of due process personal jurisdiction requirements to the facts of a particular case:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1299 (6th Cir.1989), *cert. denied,*

suit brought to enforce them can, in most instances, hardly be said to be undue....

**5.** The portion of the statute governing limited personal jurisdiction over corporations states:

The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:

(1) The transaction of any business within the state.
(2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.
(3) The ownership, use, or possession of any real or tangible personal property situated within the state.
(4) Contracting to insure any person, property, or risk located within this state at the time of contracting.
(5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

M.C.L. § 600.715.

494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990) (citing *Southern Machine Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968)); *see also Theunissen*, 935 F.2d at 1460. Furthermore, "[w]hen the first two elements are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir.1982).

■■■■ "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958). "[T]ransaction of *any* business within the state" is enough. M.C.L. § 600.715(1) (emphasis added). "The word 'any' means just what it says. It includes 'each' and 'every'.... It comprehends the 'slightest'." *Sifers v. Horen*, 385 Mich. 195, 199 n. 2, 188 N.W.2d 623 (1971) (quoted with approval in *Theunissen*, 935 F.2d at 1464, and *Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 905–06 (6th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)).

■■■■ Plaintiff's cause of action is based on an alleged breach of an employment contract. When analyzing personal jurisdiction in the context of a breach of contract claim, the solution cannot turn on "conceptualistic ... theories of the place of contracting or performance." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985) (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316, 63 S.Ct. 602, 604, 87 L.Ed. 777 (1943)). Rather, the analysis must look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties actual course of dealing." *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185; *see also Lanier*, 843 F.2d at 910.

Defendant clearly satisfies the first requirement of *Southern Machine Co., supra;* there can be no doubt that Defendant purposely availed itself of the privilege of acting in Michigan. It maintains a sales representative here, and sells its product throughout the state. For purposes of *limited* personal jurisdiction, substantial contacts with the forum state are not required.

In addition to purposeful availment, Plaintiff must also state a cause of action that arises from or is connected to Defendant's activities here. This inquiry, however, should not be entirely separated from an examination of the quality and extent of the Defendant's contacts with this state. As noted above, notions of fairness embodied in the Due Process Clause require stronger or weaker connections to the forum state depending on how closely related the cause of action is to those connections.

Plaintiff clearly satisfies this requirement. His cause of action is based on an alleged breach of an employment contract. Defendant's contacts with this state include its recruitment of Plaintiff while he lived and worked here, and its decision to permit Plaintiff to remain in Michigan for the first several months of his employment. Furthermore, given the totality of Defendant's contacts with this state, the Court finds that it would not be unreasonable to hale Defendant into a Michigan court to answer the employment-related claims of a former employee who spent time working for the company in Michigan.

■■■ The instant case can be distinguished from *Conti v. Pneumatic Products Corp.*, 977 F.2d 978 (6th Cir.1992), in which the Sixth Circuit found jurisdiction lacking. *Conti* involved claims made in Ohio by a former resident of that state that his employer had made misrepresentations when it recruited him for a position in Florida. Unlike the case before this Court, the employer used an employee search firm to contact Conti in Ohio. Conti alleged that the misrepresentations were made during telephone conversations he had with the search firm. The employer's only contacts with Ohio came in the form of mailing airline tickets to Conti while he still resided there, and allowing him to perform some preparatory work for the company while still in Ohio.[6]

---

**6.** In paragraph 4 of its Motion, Defendant indicated that it challenges venue in addition to

## B. *Plaintiff's Breach of Contract Claim is Barred by Michigan's Statute of Limitations.*

### 1. *The Standards Governing Consideration of a Motion for Summary Judgment*

Defendant has moved to dismiss Plaintiff's claim or, in the alternative, for summary judgment, based on the contention that Plaintiff's cause of action for breach of contract accrued on or before October 31, 1988. Because this Court has referred to materials beyond the pleadings in order to rule on Defendant's motion, it will be treated as a motion for summary judgment. The relevant Federal Rule holds that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.

The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial

---

jurisdiction. However, Defendant failed to argue this aspect of its motion. Plaintiff asks the Court to deny the motion for vagueness. *Totalplan Corp. of America v. Lure Camera, Ltd.*, 613 F.Supp. 451 (W.D.N.Y.1985). Given this shortcoming, this Court will considered the lack of venue claim waived. Furthermore, even if venue were improper, 28 U.S.C. 1406(a) authorizes the Court to transfer the matter to another district, making dismissal unnecessary.

7. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (Supp.1994).

court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding Defendants' motion for summary judgment.

### 2. *Statute of Limitations Analysis*

■ In Michigan, breach of contract claims must be brought within six years of the alleged breach. M.C.L. § 600.5807(8). Defendant contends that at the very latest, Plaintiff's cause of action accrued on October 31, 1988, when he was formally notified that his position with Nu–Kote was terminated as of that date. Plaintiff did not file his complaint until December 30, 1994, more than six years after October 31, 1988.

Plaintiff argues (and alleged in his complaint) that he was employed by Defendant through December 31, 1988, when his severance package and benefits ran out. He also argues that the nature of the parties' agreement concerning stock options is a question of fact that cannot be resolved on the record currently before this Court.

Plaintiff is incorrect. While further discovery might provide additional details about the stock option agreement, this Court need consider only one aspect of that agreement to resolve the statute of limitations issue: namely, whether the stock option agreement was linked to the employment relationship, and thus was terminated when that relationship was severed. Plaintiff has offered no support for his notion that this option could be exercised in connection with *any* future stock offering, regardless of whether he still was employed by Defendant. Instead, Plaintiff himself repeatedly characterizes, both in his initial complaint and in subsequent documents submitted to this Court, Defendant's

offer as linked to Plaintiff's employment at Nu–Kote. Indeed, paragraph 15 of Plaintiff's complaint expressly states that Defendant's offer of an option to purchase Nu–Kote stock "was part of the contract of employment between the parties." [8]

The only evidence Plaintiff offers that does *not* explicitly tie the stock option agreement to his continued employment with Nu–Kote is two verbal assurances he says he received from Nu–Kote executives that he would be given an opportunity to purchase stock. These conversations, which followed Defendant's rescission of its November, 1987, stock offer to Plaintiff and which occurred during the course of Plaintiff's employment with Nu–Kote, neither bolster nor undermine the link between the stock option agreement and the employment relationship. The record thus is devoid of any evidence that could affirmatively establish Plaintiff's contention that the stock option agreement was intended to survive termination of the employment relationship. Because Plaintiff cannot show that his right to purchase stock was intended to endure beyond his term of employment with Defendant, this Court finds that any such right ended with the termination of the employment relationship. Consequently, Plaintiff's claim lies within the applicable statute of limitations only if he filed his complaint within six years of the termination of his employment relationship with Defendant.

The question then becomes: When was Plaintiff's employment relationship with Defendant terminated? As noted earlier, Plaintiff argues that even if the stock option agreement did not survive termination of the employment relationship, that relationship extended through December 31, 1988, when his severance package ran out. Courts have consistently held, however, that an employee's receipt of severance benefits does not

---

**8.** Other items in the record that establish a link between the employment relationship and the opportunity to purchase stock include: Defendant's formal employment offer to Plaintiff on June 4, 1987, stating that he would be given opportunities to purchase Nu–Kote stock "[a]s part of the senior management team"; the November 17, 1987, letter to Plaintiff offering him a specific opportunity to purchase stock "[a]s part of the conditions of your employment"; Plain-

tiff's December 21, 1987, letter stating his intention to purchase stock and noting that his eligibility was "a part of the conditions of my employment"; and Defendant's January 6, 1988, letter to Plaintiff rescinding the November, 1987, offer to purchase stock and stating that Plaintiff could purchase stock in connection with a contemplated future offering "if, at the time of such offering, you are an employee of Nu–Kote."

extend the term of employment beyond the date upon which the employee ceases to perform services for the employer. For example, in *Salisbury v. McLouth Steel Corp.*, 93 Mich.App. 248, 250, 287 N.W.2d 195, 196 (1979), the Michigan Court of Appeals found that the plaintiff's wrongful discharge cause of action "accrued on the date he was discharged," regardless of "the fact that plaintiff may have subsequently received vacation or severance pay from defendant." *See also Krzyzewski v. Metropolitan Gov't*, 584 F.2d 802 (6th Cir.1978) (plaintiff's Title VII wrongful discharge claim accrued on the date she was terminated, not the date through which she received holiday and vacation pay); *Cameron v. United States Trust Co.*, 754 F.2d 109 (2d Cir.1985).

Even more to the point, in *Compton v. Shopko Stores, Inc.*, 93 Wis.2d 613, 287 N.W.2d 720, 721 (1980), the Supreme Court of Wisconsin considered whether the discharged plaintiff was eligible to participate in a plan that paid bonuses to executives who were employed by the defendant company at the end of its fiscal year. The plaintiff was discharged eight weeks before the end of the fiscal year, but received ten weeks of severance and vacation pay. 287 N.W.2d at 722–23. Because the plaintiff performed no services for the defendant company after his termination date, and because he was free to seek other employment after that date, the court held that the plaintiff was not employed by the defendant through the period covered by his severance pay, and concluded that he was not eligible to receive a bonus. 287 N.W.2d at 725. In addition, after undertaking a comprehensive survey of the law, the court found that "[s]everance pay, by definition, means compensation given to an employee upon the severance of his employment relationship;" accordingly, "severance pay does not extend the employment period, but terminates it." 287 N.W.2d at 724; *see also Feola v. Valmont Indus., Inc.*, 208 Neb. 527, 304 N.W.2d 377 (1981).[9]

Plaintiff seeks to avoid the application of this clear rule to his claim through two lines of attack, both of which are unavailing. First, Plaintiff contends that the above cases are distinguishable because they involve adversarial discharges with abrupt changes in the employment relationship, while Plaintiff's termination was amicable, less formal, and accompanied by continuing contact between Plaintiff and Nu–Kote's Executive Vice–President. Thus, according to Plaintiff, it is unclear when the employment relationship actually ended, and determination of an exact date must be left to the trier of fact.

This Court, however, sees nothing to be gained and much to be lost by eschewing a clear rule that conforms with the common understanding of severance benefits, and substituting instead an inquiry into the subjective understandings of the parties whenever a termination is allegedly "friendly." First, as noted by this Circuit's Court of Appeals, a rule that keeps the term of employment open during the period covered by severance benefits would "penalize[ ] a company for giving an employee periodic severance pay or other extended benefits after the relationship has terminated rather than severing all ties when the employee is let go." *Krzyzewski v. Metropolitan Gov't*, 584 F.2d 802, 805 (6th Cir.1978). Moreover, regardless of the "friendly" nature of the parting, Plaintiff's termination date is readily established through a combination of Defendant's written, formal designation of an effective date of discharge and the fact that Plaintiff provided no services to Defendant after that date. Disregarding this clear-cut termination date and leaving determination of the term of employment to the trier of fact would undermine the purpose of the statute of limitations, to provide a well-defined point of repose.

Next, Plaintiff argues that the overall nature of his relationship with Nu–Kote led him

---

9. Although Plaintiff cites no contrary authority, Defendant has directed the Court's attention to an Ohio county court decision, *Kruzer v. Giant Tiger Stores, Inc.*, 39 Ohio Misc. 129, 68 O.O.2d 328, 317 N.E.2d 70 (Ohio Ct.C.P.1974), which found that the plaintiff's term of employment extended past his date of discharge to include the

period covered by severance payments. This Court agrees with the *Compton* and *Feola* courts that *Kruzer* is not persuasive, particularly because the court in *Kruzer* cited only an inapposite unemployment compensation case as authority for its decision.

to form a "reasonable belief" that the opportunity to purchase stock remained available to him during the roughly two-month period covered by his severance package. However, Plaintiff's belief cannot be purely subjective; this Court cannot recognize this belief as "reasonable" unless Plaintiff produces legally sufficient evidence to support it, and he has failed to do so. Against Defendant's October 31, 1988, letter plainly stating the effective date of discharge and the terms of that discharge, Plaintiff offers no evidence of contemporaneous documents, conversations, or behavior that might alter this Court's understanding of his termination as reflected in that letter.

Having no evidence that this termination letter did not mean what it said, Plaintiff instead points to earlier assurances by Nu-Kote officers that he would be given an opportunity to purchase stock. Earlier documents and conversations are unavailing, however, because they at most alter the terms of the ongoing employment relationship and delineate Plaintiff's eligibility to purchase stock *as a New-Kote executive.* This evidence of earlier communications or understandings thus has no bearing on this Court's identification of the date upon which Plaintiff's employment relationship with Defendant was terminated.

Accordingly, because the October 31, 1988, letter from Defendant to Plaintiff unambiguously terminated Plaintiff's employment as of that date, and because no evidence suggests a continuing employment relationship beyond that date, this Court finds as a matter of law that Plaintiff's employment relationship with Defendant ended on October 31, 1988. Because Plaintiff waited more than six years from that date to bring a suit based on that relationship, the Court concludes that Plaintiff's breach of contract claim is barred by Michigan's six-year statute of limitations.

### IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion to dismiss or for summary judgment be DENIED WITH PREJUDICE insofar as it seeks dismissal based on lack of personal jurisdiction,

and that Defendant's motion for summary judgment be GRANTED insofar as it seeks judgment based on the expiration of the statute of limitations.