**William R. FENOGLIO, Plaintiff,**

v.

**AUGAT, INC. and Thomas & Betts Corporation, Defendants.**

**No. Civ.A. 97–10012–PBS.**

United States District Court, D. Massachusetts.

April 20, 1999.

48

Michael Avery, Perkins, Smith & Cohen, Boston, MA, for William R. Fenoglio, plaintiff.

Carol R. Cohen, Davis, Malm & D'Agostine, P.C., Boston, MA, Scott E. Williams, Williams & Connolly, Washington, DC, Jonathan P. Graham, Washington, DC, for Augat, Inc., Thomas & Betts Corp., defendants.

### MEMORANDUM AND ORDER

SARIS, District Judge.

#### I. *Introduction*

This case arises out of a protracted employment dispute between plaintiff, William Fenoglio, and co-defendants, Augat, Inc. ("Augat"), and Thomas & Betts Corporation ("T & B"). Fenoglio, the former Chief Executive Officer of Augat, asserts breach of an employment agreement (Count I); wrongful denial of benefits promised in a change in control agreement (Count II); wrongful denial of stock options to Fenoglio in violation of federal securities law (Count IV); and wrongful

denial of stock options in violation of state securities law (Count V).[1] The parties agree that, under the express terms of the various agreements, Massachusetts law applies.

Plaintiff has filed a motion for partial summary judgment on Counts I and II of the Amended complaint. Defendants have moved for summary judgment on Counts I, II, IV, and V. After hearing and review of the supplemental submissions, the Court *ALLOWS* plaintiff's motion for partial summary judgment on Count I (in part), and on Count II. The Court *ALLOWS* defendants' motion for summary judgment on Counts I (in part), IV, and V.

#### II. *Factual Background*

Augat was a Massachusetts corporation that manufactured electronics equipment and components. After being selected as Augat's president and chief operating officer, Fenoglio entered into an employment agreement with Augat, dated August 29, 1994. At a later point, Fenoglio also became a member of the board of directors and chief executive officer.

The employment agreement outlined salary and benefits, including Fenoglio's participation in Augat's bonus and stock option plans. Employment Agreement, ¶¶ 3.2 – 3.7. The contract provided that either party could terminate without cause, upon at least six months' prior written notification. Employment Agreement, ¶ 4.4.[2] The contract further specified that, upon termination without cause, Fenoglio was entitled to "compensation which would otherwise be payable" up to the later of the third anniversary of the commencement date, or "twelve months from the date of termination of his employment." Employment Agreement, ¶ 5.1. However,

---

1. Fenoglio voluntarily dropped Count III for breach of an oral agreement concerning benefits due under the change in control agreement.

2. Paragraph 4 provides in relevant part:
   4. *Employment termination.* The employment of the Employee by the Company pursuant to this Agreement shall terminate upon the occurrence of any of the following:

   . . .

   4.4 At the election of either party, upon not less than six months' prior written notice of termination.

any of these payments would be reduced by any payments made under the Change of Control letter agreement dated September 6, 1994. Employment Agreement, ¶ 5.1.

On September 6, 1994, his first day of work at Augat, Fenoglio signed this change in control letter agreement which provided certain benefits to Fenoglio in the event he was terminated within three years of a change in control of Augat. Included among the change in control benefits were a lump sum payment of a multiple of Fenoglio's annual salary and highest bonus level, vesting of any outstanding stock options, and a prohibition on Augat's repurchase of outstanding restricted stock awards. Change in Control Agreement, ¶ 4(c). A clause in the change in control agreement provided that, if Fenoglio were "terminated for any reason and subsequently a Change in Control shall have occurred, [he] shall not be entitled to any benefits hereunder." Change in Control Agreement, ¶ 3(a).

Over the course of the employment relationship, Fenoglio received six Augat stock option grants pursuant to agreements under the company's 1994 and 1996 stock option plans. Two of these were incentive stock options; four were "non-qualified" options. The stock option plans and agreements all required that terminated employees exercise their options within three months of termination. The 1994 and 1996 stock option plans and all of Fenoglio's agreements (except the one dated December 20, 1994) also provided that members of Augat's board of directors have four-and-a-half years after termination or retirement from the board within which to exercise their options. *See, e.g.,* Stock Option Plan, ¶ 6(f)(iv). Augat granted these stock options pursuant to stock option plans voted upon by the shareholders during annual shareholder meetings. Fenoglio presided over one such meeting on February 13, 1996, when the 1996 stock option plan was approved.

On July 16, 1996, Augat's Board of Directors voted to terminate Fenoglio's employment with the company. Fenoglio was informed orally by Augat board member John LeMasters, who replaced Fenoglio as CEO, that the Board had voted to terminate him. LeMasters offered him the opportunity to resign so that the separation would appear amicable from a public relations point of view. On the evening of July 16, 1996, Fenoglio was presented with a press release announcing his "resignation" that was to be distributed to media outlets. After a brief staff meeting on the morning of July 17, 1996, Fenoglio never returned to the Augat premises or performed any work for Augat. He did not publicly dispute the company's characterization that he had resigned.

After an exchange of letters regarding Fenoglio's severance from Augat, Fenoglio received a letter dated August 6, 1996, from LeMasters, which was accompanied by a "Schedule A" outlining the arrangements for the "separation compensation and benefits" approved by the board of directors. The letter states: "These arrangements are, of course, dependent on your timely agreement of [sic] the arrangements and receipt of one copy of the enclosed resignation letters concerning your *former* CEO and Board positions." (emphasis added). LeMasters concluded the letter on a friendly note, asking Fenoglio to get together so that "I can bring you up to date with activities of the company that I know you are still interested in as a shareholder."

The schedule contains three provisions relevant to this dispute. First, it states: "Although you have resigned as President and CEO effective July 16, 1996, Augat will pay your current compensation and benefits through your date of termination on January 16, 1997." Second, it provided that entitlement to change in control benefits "ends upon termination of your employment." Finally, and most significantly, the schedule stated: "This serves also as notice of termination of all other contracts between you and the Company requiring notice of termination, *including*

*the September 6, 1994 Change in Control Agreement.*" (emphasis added).

On October 6, 1996, Augat's board voted to pursue a merger with T & B, a Tennessee electronics firm. The merger, which qualified as a change in control for purposes of the change in control agreement, was finalized on December 11, 1996. Fenoglio filed this lawsuit on January 3, 1997. Through April 24, 1997, Augat paid Fenoglio his full salary, provided health coverage, reimbursed expenses, allowed Fenoglio to contribute to Augat's 401(k) pension plan, and made payments to that plan on his behalf. Fenoglio attempted unsuccessfully to exercise his stock options on May 20, 1997, and again on June 30, 1997.

### III. *Discussion*

#### A. *Standard*

A motion for summary judgment shall be allowed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The moving party bears the initial burden, which may be satisfied by pointing to the absence of adequate evidence supporting the nonmoving party's case. *See Hinchey v. NYNEX Corp.,* 144 F.3d 134, 140 (1st Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has met this burden, the nonmoving party must present specific facts demonstrating a genuine issue for trial, *see Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 25 (1st Cir.1997), and may not merely "rest upon mere allegation or denials of his pleading." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)).

"The trial court must view all facts and draw all inferences in the light most favorable to the nonmoving party." *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 6 (1st Cir.1997) (citation omitted). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." *Id.* (citing *Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996)).

#### B. *COUNT I: BREACH OF EMPLOYMENT CONTRACT*

##### 1. *Contract Interpretation*

■ Under Massachusetts law, interpretation of a contract is generally a question of law. *See Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1122 (1st Cir. 1995); *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir.1981); *Freelander v. G. & K. Realty Corp.,* 357 Mass. 512, 516, 258 N.E.2d 786 (1970).

■ "[T]he question of whether a contract term is ambiguous is one of law for the judge." *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32 (1st Cir.1994) (citing *FDIC v. Singh,* 977 F.2d 18, 22 (1st Cir.1992)). " 'When ... the words [of a contract] are plain and free from ambiguity they must be construed in their usual and ordinary sense.' " *National Medical Care, Inc. v. Zigelbaum,* 18 Mass.App.Ct. 570, 575, 468 N.E.2d 868, *rev. denied,* 393 Mass. 1104, 471 N.E.2d 1354 (1984) (construing a termination clause in an employment contract) (quotation omitted). In the absence of ambiguity, no question of material fact remains for the jury. *See O'Connell Mgmt. Co. v. Carlyle–XIII Managers, Inc.,* 765 F.Supp. 779, 782–83 (D.Mass. 1991).

■ However, if the wording of a contract is ambiguous, a question of fact for the jury may exist, *see Baybank Middlesex v. 1200 Beacon Properties, Inc.,* 760 F.Supp. 957, 963 (D.Mass.1991), unless "the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary," *Boston Five Cents Sav. Bank v. Secretary of the Dept. of Housing & Urban Dev.,* 768 F.2d 5, 8 (1st Cir.1985); *see*

*also Allen v. Adage, Inc.,* 967 F.2d 695, 698–99 (1st Cir.1992).

## 2. *Effective Date of Termination*

A "[c]lassic terminable at will employment contract," like the employment agreement at issue, "reserves to the parties an explicit power to terminate the contract without cause on written notice." *Fortune v. National Cash Register Co.,* 373 Mass. 96, 101, 364 N.E.2d 1251 (1977). Where the language of a termination clause is explicit, it must be enforced according to its terms. *See Zigelbaum,* 18 Mass.App.Ct. at 575, 468 N.E.2d 868. A court "cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its terms." *Id.* at 575–76, 468 N.E.2d 868. When notice is required, "the contract remains in force and must continue to be performed according to its terms during the specified period after receipt of the notice of termination." 6 Corbin on Contracts, § 1266, at 66 (1963).

The parties disagree on the effective date of termination under the Employment Agreement. The termination clause of the employment agreement between Augat and Fenoglio requires "six months' prior written notice of termination." Employment Contract, ¶ 4.4. Fenoglio contends that Augat provided him with written notice of termination in a letter dated August 6, 1996, which results in an effective date of termination of February 6, 1997. Defendants concede that Augat breached Fenoglio's employment contract by firing him without prior written notice, but argue that his only remedy is contractual damages and he is not entitled to extend his employment after his termination. In this argument, defendants miss the main point of *Zigelbaum.* While Augat had the unfettered right to terminate Fenoglio, the only effective act of termination was providing written notice six months *prior* to the effective date of termination.

The next issue is to pinpoint the date of the written notice. The oral notice to Fenoglio after the vote of the Board of Directors on July 16, 1997, was ineffective as a notice of termination. Arguably, the written press release that Fenoglio was handed that day could be deemed the written notice of termination. However, the draft press release masking a termination as a "resignation" for public relations reasons was not designed to serve that purpose. Even Augat seemed to believe it needed a written notice, as indicated by its course of conduct in sending out the August 6, 1996, letter. Also, in this litigation, defendants' counsel have not pressed me to deem the release the written notice.

Defendants do insist that the August 6, 1996, letter was merely a "proposal" for settlement (excludable as evidence under Fed.R.Evid. 408) rather than a notice of termination. Although the evidence suggests that this may be a fair characterization of certain listed terms governing separation compensation and benefits, which might be excludable as evidence of liability pursuant to Fed.R.Evid. 408, the notice portion is written as a fiat, not a settlement proposal. The letter stated quite clearly and unconditionally it was the written notice of termination of the employment agreement.[3]

A determination that the August 6, 1996, letter serves as the written notice of termination only partially resolves the parties' dispute. The next issue is whether Augat's conduct extended the effective date of termination. Plaintiff asserts that April 25, 1997, is the effective date of termination because, until that date, he was paid full salary and benefits, including benefits restricted to employees, such as the 401(k) matching plan. The employment agreement provided that it could be

---

**3.** As a practical matter, even if the press release were deemed the written notice, only three weeks of benefits (January 6 to February 6) are at stake. None of the other contract issues turns on this point.

"amended or modified only by a written instrument executed by both the company and the employee." Employment Agreement, ¶ 12. No such writing existed here. However, evidence relating to an oral modification of a contract is admissible notwithstanding a contractual provision that none of the terms of a contract may be altered or waived except by written instrument. *See Staples Coal Co. v. Ucello*, 333 Mass. 464, 468, 131 N.E.2d 763 (1956).

Plaintiff heavily relies on the continued payments as evidence of such a modification. However, defendants point out that as his employment was terminated at the election of the company, he was entitled to compensation and benefits (including retirement fringe benefits) [4] under the termination clause providing for compensation for at least one year after the effective date of termination. Employment Agreement ¶¶ 3.3, 5.1. Whether that trigger date was July 16, January 16, or February 6, Fenoglio was entitled to most or all of those payments under the termination clause. Therefore, the mere payment of benefits after the effective date of termination does not signal an agreement to extend that date.

The record supports defendants' argument that these benefits are best characterized as severance benefits which do not extend the term of employment. *See, e.g., Shah v. Nu–Kote Int'l*, 898 F.Supp. 496, 504–06 (E.D.Mich.1995), *aff'd*, 106 F.3d 401 (6th Cir.1997) (mem.); *Feola v. Valmont Indus.*, 208 Neb. 527, 304 N.W.2d 377, 383–84 (1981); *Compton v. Shopko Stores, Inc.*, 93 Wis.2d 613, 287 N.W.2d 720, 723–25 (1980) ("[S]everance pay does not extend the employment period, but terminates it."). Also, the evidence that the payroll records document April 25, 1997,

as "Date Terminated" is insufficient to support an oral modification of the effective date of termination, because it is undisputed factually that April 25, 1997, is the date when the payments were terminated.

Based on the August 6, 1996, written notice of termination, the effective date of termination under the contract is six months from that date, or February 6, 1997.[5]

### 3. *Breach of Employment Agreement*

#### a. *Bonus*

Defendants argue that Fenoglio is not entitled to bonuses for 1996 because he was not actually working at the time the bonuses were paid as is required by the bonus plans. Fenoglio disagrees, arguing that the bonuses were paid prior to the effective date of his termination on February 6, 1997.

In the Employment Agreement, "Bonuses" is listed under the heading "Compensation and Benefits," along with "Salary" and "Fringe Benefits." Employment Agreement, ¶ 3. In reference to bonuses, the employment agreement states that Fenoglio "shall be entitled to participate in bonus plans adopted by the Board." Employment Agreement, ¶ 3.2. However, all of the bonus plans specifically state that "[e]mployees must be *actively employed* at the time bonuses are paid to receive payment." (emphasis added).

██ "Plain words are to be given their plain meaning where no inconsistency results or there is no controlling indication in the instrument of other intent." *Forte v. Caruso*, 336 Mass. 476, 480, 146 N.E.2d 501 (1957) (citations omitted); *see also*

---

4. Defendants refer to Fenoglio's inclusion in the 401(k) plan as inadvertent. This suggests that Fenoglio was not entitled to the 401(k) benefits as retirement fringe benefits after the effective date of termination. The record is not clear on this point.

5. The schedule attached to the August 6, 1996, letter sets the date of termination at January 16, 1997. However, under the contract, the effective date is six months from the date of written notice, or February 6, 1997. A unilateral effort to shorten that contractual period cannot serve to modify a provision in the contract.

*Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1084 (1st Cir.1989) ("Where possible, words should be given their natural meaning, consistent with the tenor of contractual terms."). The plain or natural meaning of "active" leads this Court to the conclusion that there is a distinction between "employed" or "under contract" and "actively employed." *See* Webster's College Dictionary 14 (1992) (defining "active" as "characterized by current activity, participation, or use").

■ After his July 16, 1996, conversation with John LeMasters, Fenoglio left Augat and never resumed his duties at the company. Although, by the terms of the employment agreement, Fenoglio technically may have been "employed" between the August 6, 1996, notice of termination and the February 6, 1997, effective date of termination, he certainly was not "actively employed" under the plain meaning of the phrase. A contract must not, whenever possible, be construed so as to render any of its terms meaningless. *See Shea v. Bay State Gas Co.*, 383 Mass. 218, 225, 418 N.E.2d 597 (1981). To conclude that Fenoglio was eligible for the December 1996 bonus distribution would render the word "actively" in the bonus plans meaningless. Because Mr. Fenoglio was not actively employed in December 1996, when the 1996 bonuses were distributed, he is not entitled to a bonus for that year.

### b. *Failure To Comply with Notice Provisions*

■ Plaintiff also claims that Augat breached the employment agreement because the written notice was sent by regular mail rather than registered or certified mail as is provided for in ¶ 9 of the Employment Agreement. However, he concedes that he received written notice, albeit by regular mail, in the August 6, 1996, letter. Massachusetts courts have recognized that " 'the function of a requirement that notice be transmitted by registered mail is to provide a means of resolving disputes as to the fact of delivery of the

notice.' " *Computune, Inc. v. Tocio*, 44 Mass.App.Ct. 489, 493, 691 N.E.2d 994 (1998) (quoting *Gerson Realty, Inc. v. Casaly*, 2 Mass.App.Ct. 875, 875, 316 N.E.2d 767 (1974)); *cf. Cinder Products Corp. v. Schena Constr. Co., Inc.*, 22 Mass.App.Ct. 927, 929, 492 N.E.2d 744 (1986) (dealing with statutory requirement of notice by certified mail). Therefore, any breach is immaterial. *See id.*

### c. *Failure to Pay Post–Termination Compensation*

Plaintiff asserts that he is owed post-termination compensation through April 25, 1998. As discussed above, the effective date of termination was February 6, 1997. After his effective date of termination, Augat was required to pay Fenoglio "the compensation which would otherwise be payable to [Fenoglio] up to the last date to occur of (a) three years from the Commencement Date or (b) twelve months from the date of termination of his employment." Employment Agreement, ¶ 5.1. The latter of these two dates is February 6, 1998. Therefore, defendants are responsible, under ¶ 5.1 of the Employment Agreement, only for post-termination payments through February 6, 1998.

### d. *Vesting of Stock Options*

■ Under Augat's 1994 and 1996 Stock Plans, Fenoglio received a number of options. At issue are eight lots of Augat stock options that vested over a two-year period under an August 1994 Incentive Stock Option Agreement and December 1994 and 1995 Non–Statutory Stock Option Agreements. Fenoglio attempted to exercise these options on May 20, 1997, and again on June 30, 1997, more than three months after the effective date of termination on February 6, 1997. He argues that, as a director of Augat, he has four-and-a-half years after termination in which to exercise his options, under both the stock plans and the stock agreements. Defendants argue that, as an employee, Fenoglio only had three months. Resolu-

tion of this dispute begins with the contract language.

The 1994 and 1996 Stock Plans require Augat *employees* to exercise their options within three months of termination:

> [T]he option may be exercised within the period of three months after the date the optionee ceases to be an employee of the Company....

1994 and 1996 Stock Plans, at ¶ 6(f). They also provide that *directors* of Augat have four-and-a-half years after termination to exercise the options:

> [I]f the optionee is a director of the Company, ... the option may be exercised within the period of four and one-half years after the date of the optionee's termination or retirement as a director.

1994 and 1996 Stock Plans, at ¶ 6(f)(iv).

The incentive and non-statutory stock option agreements,[6] which granted options to Fenoglio pursuant to the 1994 and 1996 Stock Plans, contain a more detailed provision:

> (d) *Exercise Period Upon Termination of Employment.* If the Optionee ceases to be employed by the Company for any reason, then, except as provided in paragraphs (e), (f), (g) and (h) below, the right to exercise this option shall terminate three (3) months after such cessation (but in no event after the Expiration Date), *provided that* this option shall be exercisable only to the extent that the Optionee was entitled to exercise this option on the date of such cessation, and *provided further* that if such exercise (as provided in paragraphs (e), (f), (g) and (h) below) is subsequent to the period of three months after such cessation, this option shall be treated as a non-statutory option which does not meet the requirements of Section 422 of the Code.

¶ 3(d). Paragraph 3(h), which is one of the exceptions to the three month exercisability rule, specifies that directors of Augat have four-and-a-half years after termination to exercise the options:

> If the Optionee is a director of the Company ... and the Optionee ceases to be a director (other than as the result of a termination of such relationship by the Company "for cause" as specified by paragraph (g) above) this option shall be exercisable, within the period of four and one-half years after the date of the Optionee's termination or retirement as a director.

Stock Option Agreements, at ¶ 3(h). Paragraph (g) of the agreements discusses "cessation of employment" for cause.

Defendants contend that the language in those documents allowing the longer period of exercisablity does not apply to employees who are also directors. In support of this argument, they rely on extrinsic evidence. First, they point to Fenoglio's deposition, in which he conceded that he received the stock options in his capacity as an employee, not as a director, and had only three months to exercise the options.[7] Fenoglio Dep. II, at 16, 29. Second, they rely on evidence that in both the 1994 and 1996 proxy statements, Augat's shareholders voted:

> An optionee may exercise the option, to the extent vested, up to three months after the optionee ceases to be an employee or up to ... four and one-half years after the date of optionee's termination or retirement from the Board of Directors in the case of mandated options to non-employee directors.

Brandishing this proxy language, defendants argue that Augat's shareholders approved a four-and-a-half year window in only one situation—when non-employee directors received mandated options—and that they intended that employee directors

---

**6.** The 50,000 share Non–Statutory Stock Option Agreement, dated December 20, 1994 (option No. 001602), does not have a four-and-a-half year provision for directors but requires notification within three months of the cessation of employment.

**7.** After a recess, he retracted that admission.

be governed by the three-month provision.[8]

In rebuttal, Fenoglio points to evidence that other employee directors were informed that they had four-and-a-half years to exercise their options. Defendants retort that those employee directors, in fact, exercised their options within three months of termination. The affidavits concerning the defendants' course of conduct with respect to employee directors are conflicting.

The Court need not wade through this swampy extrinsic evidence, because the stock option agreements are not ambiguous. They plainly provide in paragraphs 3(d) that an employee has three months after his termination to exercise his option unless paragraph 3(h) governing directors applies. Any lurking doubt that paragraph 3(h) does not apply to employee directors is dispelled by its reference to paragraph 3(g) governing termination of employment for cause.

The defendants' motion for summary judgment is **DENIED** on this point.[9] Plaintiff's motion is **ALLOWED**.

## C. COUNT II: CHANGE IN CONTROL BENEFITS

▉ Both parties have moved for summary judgment on the question whether Fenoglio is entitled to benefits under the Change in Control Agreement. The Change in Control Agreement provides that if an employee "is terminated for any reason and *subsequently* a Change in Control shall have occurred, [he] shall not be entitled to any benefits hereunder." ¶ 3(a) (emphasis added). It also states:

Any termination by the Company or by you following a Change in Control of the Company during the Term shall be communicated by written notice of termi-

nation ('Notice of Termination') to the other party hereto in accordance with Section 6. The 'Date of Termination' shall mean the *effective date* of such termination as specified in the Notice of Termination.

*Id.* (emphasis added).

Fenoglio was given written "notice" of his termination on August 6, 1996, four months before the December 1996 change in control. Fenoglio's "effective date" of termination as specified in the notice was January 16, *after* the change in control. At issue here is whether Fenoglio was terminated by defendant(s) following a change in control, or before it. Put another way, under the Change in Control agreement, does an employee who has been given a "notice of termination" prior to the change in control have a contractual right to benefits where the effective date of termination is after the change in control?

▉ Although the issue is a difficult one, I conclude that the answer is yes for the following two reasons. First, the Change in Control Agreement itself expressly distinguishes between a notice of termination and an effective date of termination. Second, these provisions parallel the notice and effective date of termination referred to in the Employment Agreement. Employment Agreement, ¶ 4. This is hardly surprising, as the Employment Agreement expressly references the Change in Control Agreement when it conditions the amount of payments upon termination on benefits due under the Change in Control Agreement. Employment Agreement, ¶ 5.1. Separate instruments in the same transaction may be read together when, for example, the instruments are executed simultaneously, cross-reference one another, affect the same subject matter and parties, and have inter-

---

8.   Incentive stock options can only be granted to employees. It is not clear whether non-employee directors can get non-statutory stock option agreements.

9.   As pointed out above, option no. 006102 has no provision for directors and, thus, was waived for failure to exercise within three months of the termination of plaintiff's employment with Augat.

dependent provisions. *See ICC v. Holmes Transp., Inc.,* 983 F.2d 1122, 1126 (1st Cir.1993); *Chelsea Indus., Inc. v. Florence,* 358 Mass. 50, 55–56, 260 N.E.2d 732 (1970); *Gilmore v. Century Bank & Trust Co.,* 20 Mass.App.Ct. 49, 56, 477 N.E.2d 1069 (1985).

Defendants argue that the contractual provision is ambiguous in meaning and this Court should look to the preamble as extraneous evidence for guidance. Preliminary language, such as recitals in a preamble "may properly be considered in construing an ambiguous provision in an agreement." *Cullinet Software, Inc. v. McCormack & Dodge Corp.,* 400 Mass. 775, 776 n. 1, 511 N.E.2d 1101 (1987) (citing *Henry G. Meigs, Inc. v. Empire Petroleum Co.,* 273 F.2d 424, 428 (7th Cir. 1960)); *see also Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 404–05 (11th Cir.1989) (affirming a district court which, applying Florida law, considered the preamble of a change in control agreement to determine the meaning of "termination"); *Nassif v. Boston and Maine Railroad,* 340 Mass. 557, 563, 165 N.E.2d 397, 401 (1960) (stating that "recitals of [a] preamble may be used to assist in interpreting other parts of the contract").

The purpose underlying the change in control agreement can be found in its preamble: "to reinforce and encourage the *continued attention and dedication* of the Company's management ... to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a change in control of the Company." Change in Control Agreement, at 1 (emphasis added). Payment of benefits to a person who is technically an employee, but not actively one, makes little sense in light of this goal. However, the preamble cannot change the basic terms of the contract. *See Boston Edison Co. v. F.E.R.C.,* 856 F.2d 361, 365 (1st Cir.1988) (holding that "[a]ll the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contra-dicting or changing its terms") (quoting *Robert Indus., Inc. v. Spence,* 362 Mass. 751, 753–54, 291 N.E.2d 407 (1973)).

■ However, even if the termination provision were to be considered ambiguous in these circumstances, defendants do not prevail. "Massachusetts law construes ambiguous contractual language against the drafter." *ER Holdings, Inc. v. Norton Co.,* 735 F.Supp. 1094, 1100 (D.Mass.1990) (citations omitted) (applying Massachusetts law). "Indeed, the drafter of an ambiguous contractual term is generally held to any reasonable interpretation attributed to it by the nondrafting party." *Id.* (citing *Merrimack Valley Nat'l Bank v. Baird,* 372 Mass. 721, 724, 363 N.E.2d 688 (1977)). One reasonable interpretation is that Fenoglio was entitled to Change in Control benefits until his effective date of termination. Buttressing the reasonableness of this interpretation is the fact that the August 6, 1996, written termination notice expressly refers to the Change in Control Agreement. The final line of Schedule A reads: "This serves also as notice of termination of all other contracts between you and the Company requiring notice of termination, including the September 6, 1994 Change in Control Agreement." Although Fenoglio did not perform any duties after July 16, 1996, the effective date of his termination for purposes of the Change in Control Agreement was February 6, 1997.

Finally, although the language in the preamble suggests that the intent of the parties was to encourage actively employed members of management, the language in the Change of Control Agreement did not use the words "actively employed." The omission of this language, when contrasted with its use in the bonus agreement, lends weight to the plaintiff's interpretation.

Because the merger of Augat and T & B was consummated on December 11, 1996, and preceded the effective date of termination, plaintiff is entitled to the benefits outlined in the Change in Control agreement.

### D. COUNTS IV and V: FEDERAL AND STATE SECURITIES FRAUD

#### 1. Federal Securities Fraud Claim

Plaintiff alleges that defendants made misrepresentations regarding his ability to exercise stock options and his right to restricted stock, in violation of section 10(b) of the 1934 Act.

■ "To state a claim for a direct violation of section 10(b), a plaintiff must allege (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security; (2) scienter; (3) reliance/causation; and (4) damages." *Van De Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 734 (D.Mass.1995); *see also* 15 U.S.C. § 78j(b); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996).

■ Section 10(b) "extend[s] only to frauds and misrepresentation 'in connection with' the purchase or sale of the securities." *Wittenberg v. Continental Real Estate Partners,* 478 F.Supp. 504, 509 (D.Mass.1979) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). Stock options qualify as "securities" for purposes of the 1934 Act. *See Collins v. Rukin,* 342 F.Supp. 1282, 1287 (D.Mass. 1972) ("[F]raudulent representations as to securities not yet purchased by the recipient of a stock option are subject to the same federal prohibition as fraudulent representations as to securities whose sale is actually consummated.").

■ Plaintiff's securities fraud claim fails to pass muster for a number of reasons. First, the Amended Complaint fails to allege the misrepresentations with the particularity required by Fed.R.Civ.P. 9(b), which requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See also Doyle v. Hasbro, Inc.,* 103 F.3d 186, 193–94 (1st Cir.1996). The Amended Complaint (¶ 35) states: "Defendants misrepre-sented the status, validity and exercisability of plaintiff's stock options and misled plaintiff with respect to his ability to exercise options, at the latest, after the merger and change of control, as set forth in the Merger Plan adopted by the Joint Proxy Statement." Creative reading of the Amended Complaint might indicate that plaintiff is complaining about the joint proxy statement. However, the joint proxy statement included Fenoglio as among those entitled to restricted stock units and to stock options as a result of change in control. As Fenoglio agrees with these statements, he is hard-pressed to call them misrepresentations. During the briefing, Fenoglio complains about a deceptive course of conduct designed to lull him into missing the deadline for exercising his options. However, this claim is not well-pled.

Second, even if the November 7, 1996, proxy statement issued jointly by Augat and T & B contained misrepresentations as to Fenoglio's eligibility to exercise stock options, there is no evidence that it was issued with the requisite scienter. In securities fraud actions, summary judgment for the defendant is appropriate if the plaintiff merely "rests on the allegations in his pleadings and fails to submit 'any probative evidence, by affidavit or otherwise, to establish a genuine issue of material fact ... as to scienter.'" *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1448 (D.Mass.1989) (quoting *Bryson v. Royal Bus. Group,* 763 F.2d 491, 494 (1st Cir. 1985)).

■ To satisfy the scienter requirement of Rule 10b–5, plaintiffs must prove "an intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In addition, the First Circuit has assumed, without deciding, that recklessness would suffice for liability under section 10(b). *See Hoffman v. Estabrook & Co.,* 587 F.2d 509, 516 (1st Cir.1978); *Cook v. Avien,* 573 F.2d 685, 692 (1st Cir. 1978). There is not a scintilla of scienter.

Plaintiff himself believed that the stock option provisions only gave him three months. The evidence demonstrates rampant confusion as to when stock options had to be exercised by employee-directors. Accordingly, any dispute over their meaning cannot support a claim of securities fraud.

Third, the litigation began on January 7, 1997, and before that, negotiations with plaintiff, who was represented by counsel, were intense. There is no admissible evidence to demonstrate justifiable reliance by plaintiff on the joint proxy statement. Although defendants did object to honoring Fenoglio's request to exercise the options, it did so on timeliness grounds, not lack of eligibility. With respect to the restricted stock options, there is no evidence that Fenoglio detrimentally relied upon the proxy statement with respect to the exercise of options.

Defendant's Motion for Summary Judgment on Count IV is easily ***ALLOWED.***

2. *Massachusetts Securities Fraud Claim*

■ Plaintiff further alleges that defendants violated Mass.Gen.L. ch. 110A, §§ 101, 410(a)(2). Only section 410(a)(2) provides a private right of action. Courts have consistently held that there is no private right of action under Mass.Gen.L. ch. 110A, § 101. *See Arent v. Shearson/American Express, Inc.,* 633 F.Supp. 770, 775 (D.Mass.1985); *Cabot Corp. v. Baddour,* 394 Mass. 720, 724 n. 3, 477 N.E.2d 399 (1985).

■ These provisions of the Massachusetts blue sky law are "substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well." *Adams v. Hyannis Harborview, Inc.,* 838 F.Supp. 676, 684 n. 9 (D.Mass.1993); *see also Margaret Hall Found., Inc. v. Atlantic Fin. Management, Inc.,* 572 F.Supp. 1475, 1483 (D.Mass.1983).

The only material difference between the federal and Massachusetts laws is that, unlike the intent or recklessness scienter requirement of the federal law, § 410(a)(2) requires only negligence on the part of the defendant. *See Hyannis Harborview, Inc.,* 838 F.Supp. at 694; *cf. Cabot Corp.,* 394 Mass. at 726 n. 6, 477 N.E.2d 399. However, as discussed above, plaintiff has failed to present evidence that there was any negligent misstatement in the proxy statement or that any misstatement caused Fenoglio any damages. Defendants' Motion for Summary Judgment on Count V is ***ALLOWED.***

#### IV.  *ORDER*

Plaintiff's Motion for Partial Summary Judgment is ***ALLOWED*** on Count I (in part) and Count II. Defendants' Motion for Summary Judgment is ***ALLOWED*** on Counts I (in part), IV, and V.